**Charles T. HUTCHINS and Donna Hutchins, Appellants and Cross Appellees,**

v.

**Robert SCHWARTZ, Appellee and Cross Appellant.**

No. S–985/1003

Supreme Court of Alaska.

Sept. 12, 1986.

Milton L. Moss, Dennis, Kibby & Moss, Anchorage, for appellants and cross appellees.

Patrick G. Middleton, Bradbury, Bliss & Riordan, Anchorage, for appellee and cross appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice

Charles Hutchins and Donna Hutchins (Hutchins) appeal a jury verdict which awarded Hutchins $1,937.09 damages for injuries sustained in an automobile collision with Robert Schwartz (Schwartz).[1] The jury determined that Hutchins was 40% comparatively negligent. On appeal Hutchins claims that the trial court erred 1) by admitting evidence of Hutchins' failure to wear a seat belt; 2) by denying his motion for judgment notwithstanding the verdict (JNOV) and/or new trial; and 3) by finding that Schwartz was the prevailing party and entitled to attorney's fees. Schwartz cross appeals the trial court's award of costs. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a two-car collision. Hutchins testified he was driving at approximately 50 mph and slowed to 40–45 as he approached an intersection since the speed limit changes to 40 mph. Schwartz and Patrick Michels, his passenger, testified that Schwartz stopped at the intersection and waited for oncoming traffic to pass. When it appeared clear to turn, Schwartz began a left hand turn. Hutchins and Robin Leonard, a witness, testified that Schwartz never stopped before making the turn. As Schwartz made the left hand turn, Hutchins' car collided with the passenger side of Schwartz's car. Neither Schwartz nor Michels saw Hutchins' headlights before making the left turn.

1. Donna Hutchins does not raise any claims of her own. Therefore we refer only to Mr.

Hutchins was not wearing a seat belt at the time of the accident. He sustained cuts on his head, bruises on his chest, knee and wrist, and a broken big toe. The parties were taken to the emergency room at Providence Hospital.

Hutchins sued Schwartz for $275,000 compensatory damages. He filed a motion *in limine* to exclude evidence of his non-use of a seat belt. Judge Milton M. Souter denied the motion, ruling that evidence of Hutchins' failure to wear a seat belt could be used by Schwartz to argue for a reduction of damages.

At the end of the trial, Judge Souter granted Hutchins' motion for directed verdict on the seat belt issue. The jury was instructed to disregard all evidence relating to Hutchins' non-use of a seat belt.

The jury returned a verdict finding Schwartz 60% negligent and Hutchins 40% comparatively negligent. It awarded Hutchins $1,937.09 in damages.

Hutchins moved for JNOV and/or a new trial. The motion was denied. In entering judgment, the court found that Schwartz was the prevailing party and awarded him attorney's fees of $17,000. Hutchins' appeal followed. Schwartz cross-appealed regarding the court's directed verdict on the seat belt issue and its award of costs.

## II. DID THE TRIAL COURT ERR BY ADMITTING EVIDENCE OF HUTCHINS' NON–USE OF A SEAT BELT?

Hutchins claims that the trial court erred by denying his motion *in limine* and allowing evidence on Hutchins' non-use of a seat belt. He contends that this error was not cured by the trial court's subsequent instruction telling the jury to disregard the seat belt evidence. Hutchins urges the court to follow the jurisdictions which reject evidence of non-use of seat belts.

Schwartz argues that the trial court did not abuse its discretion by admitting evi-

Hutchins as "Hutchins".

dence of Hutchins' non-use of a seat belt. Alternatively Schwartz contends that the trial court's error, if any, was harmless since it gave a curative instruction and directed a verdict against Schwartz on the issue. Therefore, the issue never went to the jury.

■ The standard of review of a trial court's decision to admit evidence is abuse of discretion. *Dura Corp. v. Harned,* 703 P.2d 396, 409 (Alaska 1985).

We have not addressed whether failure to use a seat belt can be used in a personal injury action as evidence of comparative negligence.

■ In Alaska the administrative code requires passenger cars made after January 1, 1965 to have lap belts installed and those made after January 1, 1968 to have either lap belts or shoulder belts installed. 13 AAC 04.270. However, there is no statutory requirement that an adult person must wear a seat belt while driving or riding in a car.[2] We conclude, as do most courts, that statutes which require installation of seat belts do not thereby mandate the use of seat belts. *See e.g., Kopischke v. First Continental Corp.,* 187 Mont. 471, 610 P.2d 668, 679 (1980); *Amend v. Bell,* 89 Wash.2d 124, 570 P.2d 138, 143 (1977).

The question is whether we should impose a duty upon a person to wear a seat belt when driving a car equipped with one.

Most jurisdictions, whether they have adopted comparative or contributory negligence, have rejected the proposition. *See Amend,* 570 P.2d at 143–44 and cases cited therein. In *Amend,* the Washington Supreme Court stated the reasons upon which most courts rely when declining to impose a duty upon all persons riding in a car equipped with seat belts.

First, the defendant should not diminish the consequences of his negligence by the plaintiff's failure to anticipate defendant's negligence. Plaintiffs are not required to predict a defendant's negligence. 570 P.2d at 143.

Second, seat belts are not required in all vehicles.

Third, a majority of motorists do not habitually use their seat belts.

Fourth, admission of evidence of non-use would lead to a "battle of experts" as to what injuries would have or have not been avoided if plaintiff had worn a seat belt. *Id.*

Other courts have declined because the legislature has not mandated seat belt use. The decision as to whether people should wear seat belts is one of policy and best left to the legislature. *Fischer v. Moore,* 183 Colo. 392, 517 P.2d 458, 460 (1973); *Kopischke,* 610 P.2d at 681, 683; *Fields v. Volkswagen,* 555 P.2d 48, 62 (Okla.1976); *Robinson v. Lewis,* 254 Or. 52, 457 P.2d 483, 485 (1969).

Other courts have declined because the duty to avoid a defendant's negligence and mitigate one's own damages does not arise until after the accident and injury have occurred. *See Clarkson v. Wright,* 108 Ill.2d 129, 90 Ill.Dec. 950, 952, 483 N.E.2d 268, 270 (Ill.1985). Note, *The Seat Belt Defense: A Comprehensive Guide for the Trial Lawyer and Suggested Approach for the Courts,* 56 Notre Dame Law. 272, 285 (1980) (hereinafter "Seat Belt Defense"). Hutchins argues that a defendant must take his plaintiff as he finds him under the "eggshell skull" theory.

The supreme courts of Florida and Wisconsin, however, have taken a contrary view.

In *Bentzler v. Braun,* 34 Wis.2d 362, 149 N.W.2d 626 (1967), the Wisconsin Supreme Court recognized that there was a demonstrable link between wearing seat belts and minimizing injuries. *Id.,* 149 N.W.2d at 639–40. The failure to wear seat belts was not negligence per se but

> where seat belts are available and there is evidence before the jury indicating causal relationship between the injuries sustained and the failure to use seat

**2.** AS 28.05.095(a) provides that a child under the age of seven must be properly secured in an approved safety device or in a seat belt, whichever is appropriate for the particular child.

belts, it is proper and necessary to instruct the jury in that regard. A jury in such case could conclude that an occupant of an automobile is negligent in failing to use seat belts.

*Id.,* 149 N.W.2d at 640.

In a subsequent case, the Wisconsin court stated that the seat belt defense

> is this court's recognition that in light of the realities of the frequency of automobile accidents and the extensive injuries they cause, the general availability of seat belts, and the public knowledge that riders and drivers should "buckle up for safety," those who fail to use available seat belts should be held responsible for the incremental harm caused by their failure to wear available seat belts.

*Foley v. City of West Allis,* 113 Wis.2d 475, 335 N.W.2d 824, 828 (1983) (footnotes and citations omitted).

The Wisconsin court suggested that the so called "seat belt defense" comports with the principles underlying comparative negligence. A plaintiff only recovers damages for injuries caused by defendant and not for those that plaintiff could have prevented by wearing a seat belt. *Foley,* 335 N.W.2d at 830–31.

In *Insurance Co. of North America v. Pasakarnis,* 451 So.2d 447, 453 (Fla.1984), the Florida Supreme Court stated:

> As we have already expressly acknowledged in [*Ford Motor Co. v.*] *Evancho* [327 So.2d 201], automobile collisions are foreseeable as are the so-called "second collisions" with the interior of the automobile. The seat belt has been a safety device required by the federal government for nearly twenty years. 15 U.S.C. §§ 1391–1425 (Supp.1965–69), 32 Fed. Reg. 2408, 2415 (1967). In a 1982 study by the United States Department of Transportation, National Highway Safety Administration Technical Report entitled the "Effectiveness and Efficiency of Safety Belt and Child Restraint Usage," it is reported that the evidence for the effectiveness of safety belts in reducing deaths and injury severity is substantial and unequivocal.

In light of the importance of the seat belt as a safety precaution and the minimal effort required to fasten an available seat belt, the court concluded that failure to wear one could be a pertinent factor for the jury to consider in determining damages. *Id.*

We agree with the reasoning of the Florida and Wisconsin courts. These courts persuasively rebut the arguments of those holding the contrary.

▮▮▮ Automobile accidents are foreseeable. The fact that many motorists do not wear seat belts may suggest that a failure to use a seat belt does not violate a standard of care. However, the fact that a majority of people act in a certain manner does not make that conduct reasonable especially when that conduct involves an unnecessary risk. *See Seat Belt Defense, supra,* 56 Notre Dame Law. at 281.

Most studies indicate that seat belt use is more advantageous than non-use since it prevents serious injuries. *See,* Snyder, *The Seat Belt as a Cause of Injury,* 53 Marq.L. Rev. 211 (1970) (numerous medical studies cited); 16 Am.Jur.Proof of Facts, *Seat Belt Accidents* § 5 at 117–18, § 36 at 138–39 (Supp.1980) (statistics as to injuries avoided if seat belts used).

As to a "battle of experts", juries are constantly evaluating expert testimony. This is not unique to the seat belt issue.

In *Pasakarnis,* the court responded to the argument that it should reject evidence of non-use absent specific legislation requiring the use of seat belts. The court stated that it has a duty to ensure that the law remains both fair and realistic as society and technology change. 451 So.2d at 451. The court primarily modernized the law of torts as seen in its decisions of comparative negligence and loss of consortium. *Id.* Additionally, the absence of a legislative mandate to wear seat belts means only that the failure to use one cannot constitute negligence per se. *See Bentzler,* 149 N.W.2d at 639; *Clarkson,* 483 N.E.2d at 271 (Ryan, J., dissenting).

Regarding a plaintiff's duty to mitigate damages before the injury occurs, the *Foley* court stated that when the plaintiff's pre-injury conduct does not cause the accident but aggravates the ensuing damages, then damage reduction is "the better view unless we are to place an entirely artificial emphasis upon the moment of impact, and the pure mechanics of causation." *Foley*, 335 N.W.2d at 830, *quoting* Prosser, Law of Torts § 65 at 423–24 (4th ed. 1971). *See also*, Restatement (Second) of Torts § 465 (1965).

■ We conclude that the failure to wear a seat belt is relevant evidence for the purpose of damage reduction. However, we do not choose to categorize such evidence as a "seat belt defense". Rather, the concept of comparative negligence contemplates the inclusion of all relevant factors in arriving at the appropriate damage award and non-use of a seat belt is a relevant factor for apportioning damages. *See* Hoglund & Parsons, *Caveat Viator: The Duty to Wear Seat Belts Under Comparative Negligence Law*, 50 Wash.L.Rev. 1, 14, 27 (1974). We find it unnecessary to wait for legislative action on this subject. *Cf. Kaatz v. State*, 540 P.2d 1037, 1049 (Alaska 1975) (court judicially adopted comparative negligence).

Therefore, if under the facts and circumstances of the case a reasonably prudent person would have used a seat belt and if plaintiff suffered more severe injuries as a result of not wearing a seat belt, then the jury should be permitted to consider this factor in assessing damages.

In this case, we do not need to determine the extent to which seat belt evidence is relevant since the trial court directed a verdict against Schwartz on this issue.

We conclude that the trial court did not abuse its discretion by admitting evidence of Hutchins' failure to wear a seat belt. The court gave a subsequent jury instruction to disregard such evidence since it found that Schwartz presented insufficient evidence that the seat belt system actually worked and that Hutchins' injuries were caused by his failure to wear a seat belt.

The subsequent instruction removed any possibility of jury confusion or prejudice. *Cf. Murray E. Gildersleeve Logging Corp. v. Northern Timber Corp.*, 670 P.2d 372, 382 (Alaska 1983).

### III. DID THE TRIAL COURT ERR BY DENYING HUTCHINS' MOTION FOR NEW TRIAL AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT?

Hutchins contends that the trial court erred in denying his motion for JNOV and/or new trial because 1) there is no evidence showing that he was 40% comparatively negligent, and 2) the damages are so "inadequate as to shock the conscience" and could only be the result of passion and prejudice.

■ In reviewing motions for JNOV this court must view the evidence in a light most favorable to the non-moving party and determine, without weighing or judging the credibility of the witnesses, whether the evidence is such that reasonable minds could not differ in their judgment. *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978), *disapproved on other grounds, Native Alaskan Reclamation and Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211 (Alaska 1984). The test is objective and if there is room for diversity of opinion among reasonable people, the question is one for the jury. *Id.*

■ In reviewing a ruling on a motion for new trial, this court will not interfere with the trial court's decision except in the most exceptional circumstances and to prevent a miscarriage of justice. *City of Whittier*, 577 P.2d at 222. If there is an evidentiary basis for the jury's decision, then the denial of a motion for new trial must be affirmed. *Id.* If the evidence is so slight and unconvincing as to make the verdict unreasonable and unjust, then we must reverse the denial of the motion for new trial. *Id.*

A. Comparative Negligence.

1. Headlights.

Hutchins claims that the evidence conclusively established that he had his headlights on and was driving with suitable caution. Schwartz claims that there was evidence showing that Hutchins' headlights were not on or not visible and that he was driving too fast for the road conditions.[3]

Patrick Michels, who was sitting in the passenger seat of Schwartz's car, testified that he did not see any headlights approaching just before the accident. Michels said he was looking straight ahead at the oncoming traffic before Schwartz turned. They waited for a few cars to pass and began the turn. *Id.* He then looked out the passenger window and saw a "dark object" come and hit Schwartz's car.

Michels testified that "[w]hen somebody's going to park a car right in your lap, you remember that.... If there have (sic) been, you know, lights, it would have brightened up the whole inside of the car."

Schwartz testified that he stopped before making the turn and waited for oncoming traffic to go by. When it was clear, he made his turn. He did not see any headlights approaching. Schwartz remembers telling Police Officer James A. Stirling to check the headlights on Hutchins' car because he believed they were not on before the accident.

Officer Stirling investigated the accident and examined what was left of the headlights on Hutchins' car. He examined the headlights because someone, he thinks Schwartz, asked him to see if Hutchins' headlights had been on. Based upon his examination of the headlight filaments, he concluded that the headlights were on at the time of the accident. Officer Stirling also testified that the visibility that day was three to five hundred feet. He did not know whether the headlight covers were clean or dirty. He stated that there was probably some road film and dirt on them unless Hutchins had stopped a block down

the road and wiped them off. The longer one drives without wiping the covers off, the less visible they become. Officer Stirling concluded that the accident was caused by Schwartz's left hand turn.

Daniel Aasmunstad, a part time investigator, investigated the scene of the accident almost a year later. He took photographs of northbound vehicles with and without their lights on. Mr. Aasmunstad testified that he could see a car without headlights at approximately 150–170 yards away.

No one checked the headlight switch in Hutchins' car to see if it was in the "on" position.

2. Speed of Hutchins' Car.

Officer Stirling testified that the temperature was nine degrees and the road conditions were slippery but not glare ice. The coefficient of friction rating (the amount of resistance the roadway represents to travel) was .3. Glare ice has a .1 rating and normal dry roads would have a .7 rating.

Officer Stirling testified that he would probably reduce his speed from the posted speed limit when the roads had a .3 rating.

Hutchins testified that he was traveling at 40–45 mph. The speed limit approaching the intersection was 50 mph but it changed to 40 mph approximately 150 feet north of the accident site. At trial Hutchins stated that the road was frozen but he was not slipping. However, on cross-examination Schwartz's counsel read Hutchins' deposition in which he stated they were icy and slippery.

Therefore, it appears that Hutchins was driving at the speed limit and that it was for the jury to decide whether this was too fast for the road conditions.

 After reviewing the evidence in a light most favorable to Schwartz, we conclude that reasonable minds could differ as to whether Hutchins' headlights were on or off. Although the testimony of Officer

---

**3.** The jury was instructed that it must find Hutchins negligent if it found that he did not have his headlights on and/or was not driving at a reasonable speed given the road conditions.

Stirling is persuasive, the question was for the jury. Additionally, the jury could have concluded that Hutchins was traveling too fast for the road conditions. We conclude that there is an evidentiary basis for the jury's finding that Hutchins was 40% comparatively negligent.

### B. Damages.

Hutchins claims that the jury's damages award is so low that they must not have properly applied the instructions to the evidence. As Schwartz indicates, Hutchins challenges the entire verdict but specifically addresses past medical expenses, past pain and suffering regarding a hiatal hernia, and past lost earnings.

Hutchins claims that he proved past medical expenses of $20,794.00. This figure includes expenses for emergency room treatment at Providence Hospital on the night of the accident, visits to Doctors White and Brudenell, chiropractic treatment for back injuries allegedly suffered in the accident and treatment of a hiatal hernia. The jury awarded Hutchins $937.00 for medical expenses. It appears that the jury did not award Hutchins for the chiropractic and hernia treatment.[4]

Hutchins was initially treated at Providence where he was X-rayed and treated for cuts on the head, bruises on the chest and knees and a broken big toe. He did not stay overnight at the hospital. The bill from Providence was $596.00.

Dr. Roy Matison White examined Hutchins two days after the accident. Hutchins retained a lawyer shortly thereafter and requested Dr. White to write a letter about Hutchins' condition. Dr. White read the letter which stated:

At the above-mentioned follow-up, the patient was examined and found to have blue markings across the chest and lateral ribs which were tender when pressed upon. However, upon closer examination, it was felt that the blue marks were artificial and this was proven when they

were removed with isopropal alcohol. The patient then immediately stated that he was wearing a purple shirt at the time of the accident and that this must have been the source of the blue marks. It appeared at the time that this explanation was not adequate for the amount of dye which was seen on his chest and the dye was noted to penetrate to the follicles of the hairs of the chest indicating rather generous application. Further examination revealed some legitimate abrasions and contusions to the forehead, some contusions of the foot and the left great toe. It was determined that the injuries were not substantial and that the patient should do quite well with some healing time....

Dr. White's notes from the examination had the word bruises in quotes. He testified that he used quotes because bruises do not "come off with alcohol." The notes also contained the word "factitial" which means "an apparent medical problem which has been introduced by someone else other than natural causes." Dr. White also read a report of · X-rays received from Providence Hospital. The report indicated that the X-rays of Hutchins' chest, ribs, knees and skull were normal.

At trial, Hutchins testified that he had purple-blue markings on his chest because the night before he saw Dr. White he put Ben Gay on his chest and wore a new New York Yankee's T–Shirt to sleep. The dye apparently came off on his chest.

Joanna Gossen, a friend of Schwartz, arrived at the emergency room after the accident. While waiting for Schwartz, she saw Hutchins limp a little and then limp even more after he saw her and another friend of Schwartz's.

Dr. Brudenell, an orthopedic surgeon who had treated Hutchins for knee problems before the accident, also examined Hutchins. Dr. Brudenell examined the X-rays that the chiropractor took and did not

---

**4.** Hutchins asked for $10,000 in future medical expenses. The jury did not distinguish between past and future medical expenses.

see any compression fracture or significant spinal injury.

Dr. Simon Carraway, Hutchins' chiropractor, testified that Hutchins had been seeing him regularly since the accident. Hutchins came to Dr. Carraway complaining of lower-middle back pains, poor sleep, low energy, and headaches.

Dr. Carraway stated that Hutchins has lateral deviation in three places in his back. He also referred to this as scoliosis. Dr. Carraway testified that the trauma of hitting the steering wheel and windshield caused his back problems.

Dr. James B. Watson and Dr. Frederick R. Hood both testified regarding Hutchins' hiatal hernia. A few weeks to months after the accident, Hutchins began having a burning sensation in his throat. In April 1982, Dr. Watson diagnosed a hiatal hernia. He stated that sudden abdominal trauma or chest trauma can cause hiatal hernias. It was Dr. Watson's opinion that his hernia problems were caused by the accident trauma. Hutchins finally had surgery since other medications did not seem to be working. Dr. Watson also testified that hiatal hernias are very common and they can be the result of stress and weight gain. He stated that no one can definitely say what the causes of hiatal hernias are.

Dr. Hood, who performed the surgery on Hutchins, testified that hiatal hernias are very common. He thought that it was entirely possible that the hernia was either produced or made worse by the accident. He stated that there was no way to establish that trauma caused the hernia and that there are many causes of hiatal hernias. During surgery, Dr. Hood saw "nothing that would indicate that his hernia was, in fact, on the basis of trauma." Doctors Watson and Hood did not believe Hutchins was disabled by the hernia.[5]

Schwartz argues that Hutchins' hernia could have been caused by factors other than the accident. He presented evidence that Hutchins was taking a lot of aspirin and salicylates for his knee and accident injuries. These drugs caused Hutchins to experience stomach problems. Hutchins was under stress from his job. He had gained 13 pounds since the accident and increased weight can be a cause of hiatal hernias.

Hutchins claimed $18,500 in lost earnings. The jury awarded $250. Hutchins specifically claims on appeal that the accident caused him to lose a $5,500 bonus for 1981. Hutchins sold computers for ACI. If Hutchins had earned $277,000 for ACI in 1981, he would have received a $5,500 bonus. At the time of the accident, he was $15,000 short. Hutchins claims that he had numerous proposals in December and since he did not work the last weeks of December he did not make the $15,000 nor the bonus. Hutchins closed certain sales, which he claims were in negotiation in December, in the middle of January.

It is not at all clear from the evidence whether Hutchins would have earned this bonus.

It is not clear how long it takes to close a sale. Hutchins' superior, Terry Parks, testified that a sale normally takes 60–90 days. A commission is not earned until the sale is closed, which occurs when the equipment is installed. Therefore Hutchins could only earn the bonus if the negotiations and needs analysis were completed and equipment was installed by the end of December 1981. Mr. Parks indicated that Hutchins' sales in January were to existing customers and those sales can take as long as 30–90 days.

We cannot say that Hutchins would have earned this bonus but for the accident. Even if the negotiations were underway, the sales themselves may not have been completed by the end of December.

Hutchins asked for $75,000 for lost enjoyment of life and physical impairment. The jury did not award anything. Hutchins testified that he cannot downhill ski, bowl, or roughhouse with his children any-

5. We do not discuss Hutchins' post-surgery problems. If the jury decided Hutchins' hernia was not a result of the accident, then it would not award anything for his subsequent problems.

more because it hurts his back. However, he also testified that he still lifts light weights, cross country skis and plays softball. Hutchins is the pitcher for the Stoltz Home Center Team. He sometimes slides into base while playing. In light of this evidence, the jury could have concluded that Hutchins had not suffered any significant loss of enjoyment of life or physical impairment.

As to the damages, we conclude that reasonable minds could differ on the causal relationship between the accident and Hutchins' back injuries and hiatal hernia. The resolution of this issue turns upon the credibility of the witnesses. In *Hayes v. Xerox Corp.*, 718 P.2d 929, 933, (Alaska 1986), we upheld the jury's low verdict stating that jurors make credibility choices and determine the weight to be given the evidence. Here, the jury could have believed the testimony that Hutchins' injuries were not substantial and could have found that the causal relation between the accident and the hiatal hernia was not proved and that the lost earnings were speculative.

■ Although the verdict is low compared to the amount Hutchins requested, we conclude that the evidence supporting the verdict is not so slight and unconvincing as to make it plainly unreasonable and unjust.

In summary, there is an evidentiary basis for the jury's finding of comparative negligence and its damage award. Additionally, reasonable minds could differ on both issues. Therefore, the trial court did not err by denying Hutchins' motion for JNOV and/or new trial.

## IV. DID THE TRIAL COURT ABUSE ITS DISCRETION BY AWARDING ATTORNEY'S FEES TO SCHWARTZ AS THE PREVAILING PARTY?

Schwartz moved for an award of attorney's fees on two separate grounds. First, he argued that he was the prevailing party under Civil Rule 82 because Hutchins had sought over $275,000 in damages but was awarded less than $2,000. Second, the verdict was less than Schwartz's offer of judgment for $35,000 and therefore under Rule 68 Schwartz was entitled to fees after September 20, 1984, the date of the offer.[6]

In awarding Schwartz attorney's fees, the trial court stated that it found "defendant was the prevailing party and has considered [defendant's] actual fee expenditure, its reasonableness, the excellent quality of [defendant's] counsel's work, the exposure of $275,000 plus interest, etc. faced by [defendant], and the excellent work done by [plaintiff's] counsel."

Hutchins argues that the trial court erred by finding Schwartz the prevailing party and awarding him $17,000 attorney's fees. Hutchins claims that he prevailed on the liability issue and is therefore the prevailing party under Civil Rule 82. Schwartz argues that the award of attorney's fees was not an abuse of discretion since it is proper under either Civil Rule 82 or 68.

■ Although the trial court did not indicate whether it awarded fees under Rule 68 or 82, this distinction is irrelevant here. The trial court found Schwartz to be the prevailing party. Therefore, Schwartz is entitled to partial reasonable attorney's fees under Rule 82. *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 588 (Alaska 1973). In this context, Rule 82 subsumes Rule 68 which also limits an award to partial reasonable post-offer fees. *Jakoski v. Holland*, 520 P.2d 569, 578–79 (Alaska 1974). As the prevailing party, Schwartz can receive the maximum amount of attorney's fees under Rule 82. The fact that he made an offer of judgment under Rule 68 does not increase or diminish an award of attorney's fees to a prevailing defendant.

---

**6.** Alaska R.Civ.P. 82(a)(1) provides in pertinent part:

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount.

Alaska R.Civ.P. 68 provides in part that if "the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer."

 The determination of who is the prevailing party under Rule 82 is within the trial court's discretion and reviewable on appeal only for an abuse of that discretion. *Continental Insurance Co. v. United States Fidelity & Guaranty Co.*, 552 P.2d 1122, 1125 (Alaska 1976) *disapproved on other grounds, Farnsworth v. Steiner*, 638 P.2d 181 (Alaska 1981). Prevailing party status does not automatically follow if the party receives an affirmative recovery but rather it is based upon which party prevails on the main issues. *Id.* A party who successfully defeats a claim of great potential liability may be the prevailing party even if the other side is successful in receiving an affirmative recovery. *Alaska Placer Co. v. Lee*, 553 P.2d 54, 63 (Alaska 1976); *see also Owen Jones & Sons, Inc. v. C.R. Lewis Co.*, 497 P.2d 312, 314 n. 5 (Alaska 1972).

 Schwartz faced a potential liability of $275,000 but must pay only $1,937.09 less 40%. The jury awarded Hutchins nothing for his claims of future lost income and lost enjoyment of life. Additionally, Hutchins did not prevail entirely on the issue of liability since he was found to be 40% comparatively negligent. In light of the foregoing facts, we conclude that the trial court did not abuse its discretion by finding that Schwartz was the prevailing party.

The trial court has wide discretion in awarding attorney's fees to a prevailing party. *Alaska Placer Co.*, 553 P.2d at 63 (Alaska 1976). We will interfere with the trial court's determination as to attorney's fees only if the award is "manifestly unreasonable." *Id.*

 Schwartz incurred $42,397 in attorney's fees, but requested $24,438.20 (60%). Under Rule 82, the trial court's award of $17,000 was not manifestly unreasonable.[7]

## VI. DID THE COURT ERR IN ITS AWARD OF COSTS TO SCHWARTZ?

On cross-appeal, Schwartz argues that the clerk erred because it awarded costs under Civil Rule 79 and not actual costs under Rule 68.[8]

 Under Rule 68, Schwartz is entitled to costs incurred after the date of the offer of judgment. *See supra* n. 5 for text of Rule 68. In *Truckweld Equipment Co. v. Swenson Trucking & Excavating, Inc.*, 649 P.2d 234, 240 (Alaska 1982), we stated that Rule 68 "explicitly awards actual costs in [these] circumstances," although it does not award actual attorney's fees. In *Hayes v. Xerox Corp.*, 718 P.2d 929, 940 (Alaska 1986), we held that the term "costs" is read similarly under Rule 68 and the rules governing the taxation of costs under Civil Rule 79 and Administrative Rule 7. Therefore, the clerk properly awarded costs on the basis of Rule 79. Similarly, the court did not err in affirming the clerk's award.

The clerk deferred the decision of awarding expert witness fees to the trial court. The court did not award any expert witness fees nor state its reason for not doing so.

---

7. Hutchins also argues that Schwartz failed to qualify the venire on their relationship with Dr. Roy Matison White and thus denied his right to peremptorily challenge a juror who was once examined by Dr. White.

This argument lacks merit. Hutchins knew that Dr. White would testify since he was listed as one of Schwartz's rebuttal or primary witnesses. He could have asked the jury on voir dire if they knew Dr. White. Counsel has the opportunity on voir dire to inquire into all matters within his knowledge which might affect the qualification of the jurors, and then reasonably raise any objection that might exist as to any member. *Perkins v. State*, 695 P.2d 1364, 1368 (Okla.Crim.App.1985); *Greathouse v. State*, 503 P.2d 239, 241 (Okla.Crim.App.1972). If counsel fails to do so, he waives any objection on that point. *Id.* Therefore, Hutchins' counsel waived his right to peremptorily challenge any juror based on his or her relationship with Dr. White. *See Grimes v. Haslett*, 641 P.2d 813 (Alaska 1982) (right to peremptory challenge can be waived).

8. On cross appeal, Schwartz also claims that the trial court erred by directing a verdict on the seat belt issue. However, he seeks relief on this claim only if we reverse the judgment. Therefore we do not address this issue.

The court's failure to award these fees was obviously an oversight.

Schwartz claims that he is entitled to expert witness fees for Mr. Terry Day, who testified as a seat belt expert, and for Doctors White, Watson, Brudenell, Hood and Carraway. We remand this issue to the trial court to determine costs under Administrative Rule 7(c), which provides:

(c) Expert Witnesses. A witness called to testify as an expert shall receive additional compensation to be fixed by the judge with reference to the value of the time employed and the degree of learning or skill required; but such additional compensation shall not exceed $25.00 per hour while so employed and testifying, except as otherwise provided in these rules. No more than three expert witnesses shall be allowed to testify on each side as to the same issue in any given case, unless the judge trying the case, in his discretion, permits an additional number of witnesses to testify as experts.

The trial court can award Schwartz expert witness fees, not to exceed $25.00 per hour, for the time the expert *actually* spent testifying. *Eagle Air, Inc. v. Caroon and Black/Dawson and Co. of Alaska*, 648 P.2d 1000, 1007 (Alaska 1982).

Therefore, Schwartz's award can include fees for Dr. White and for Mr. Terry Day's time spent testifying and for travel expenses to and from court, but not for time spent in trial preparation.

Schwartz also claims he is entitled to Doctors Brudenell's and Hood's deposition fees since they testified by deposition at trial. Schwartz can only recover fees for the time spent actually reading the depositions in court since the depositions were taken before the offer and expert fees should not exceed $25.00 per hour. The costs for Doctors Carraway and Watson should not be allowed since Schwartz omitted them from his cost bill. He listed the fees for these doctors' depositions but not for their time testifying at trial.

The decision of the superior court is AFFIRMED in part and REMANDED for a determination of expert witness fees consistent with this opinion.