**Suh Joon YANG and Ha Sook Yang, Appellants,**

v.

**Chun Young YOO and Jun Nam Yoo, Appellees.**

No. S–3380.

Supreme Court of Alaska.

May 31, 1991.

George Trefry, Perkins Coie, Anchorage, for appellants.

John C. Pharr, Law Offices of John C. Pharr, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

The Yoos sold the Inlet Inn in downtown Anchorage to the Yangs. The Yangs defaulted on their payments to the Yoos, and the Yoos sought judicial foreclosure. The Yangs filed a counterclaim alleging that the Yoos promised to return their down payment if the Inlet Inn's revenues for the first year did not exceed $1 million. The Yangs argued that their default was excused and they were entitled to receive their down payment back since the Inlet Inn's revenues were much less than promised. After a jury trial, the superior court entered judgment in favor of the Yoos and ordered foreclosure and sale of the property. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In October 1985, Suh Joon Yang and Ha Sook Yang came to Anchorage to look into the possibility of purchasing the Inlet Inn from Chun Young Yoo and Jun Nam Yoo. The Inlet Inn is a 93–room hotel located in downtown Anchorage near the bus station. The Yangs met with real estate agent Ken Zong, who had informed them of the opportunity to buy the Inlet Inn. Zong showed the Yangs the Inlet Inn, as well as several other hotels. The Yangs inspected the physical premises of the Inn and a brief financial report prepared by Zong indicating that the previous year's room revenues were $960,000. Before returning to Los Angeles where they were living at the time, the Yangs made an offer to purchase the Inlet Inn for $2,700,000.

The Yoos made a counter-offer to sell the Inn for $3,100,000, which the Yangs rejected. According to the Yangs, they nevertheless remained interested in the Inn because Zong assured them that the Yoos would refund the down payment, retake possession of the hotel, and reassume the underlying note if revenues during the Yangs' first year of ownership did not at least equal the revenues for the previous year. The Yangs consulted Michael Kim, a Korean-speaking attorney in Los Angeles, who drafted some language which he understood incorporated the substance of the Yoos' guaranty.

Mr. Yang made a second trip to Anchorage and met with Zong and the manager of the Inlet Inn, Myung Ho Won. They reviewed the Inn's daily revenue reports.

Yang returned to Los Angeles, and several days later he received a call from Zong and Mr. Yoo. According to the Yangs, Yoo confirmed that he would retake possession of the Inlet Inn and refund the Yangs' down payment if future revenues did not equal or exceed $1 million per year. At trial Yoo denied making a guaranty for future revenues, but admitted that he had guaranteed the past income.

Before traveling to Anchorage to consummate the transaction, the Yangs again visited their Los Angeles attorney Mr. Kim. He prepared a second document designed to protect the Yangs in the event that revenues during their first year of ownership did not reach the guaranteed minimums and thereby provide sufficient cash flow to meet their debt obligations.

On January 10, 1986, the Yangs executed a "Sales Agreement and Earnest Money Receipt" prepared by Zong. The Yoos had signed the agreement on December 18, 1985. The Yangs made a few changes to which the Yoos agreed. The agreement states a purchase price of $3,050,000. The Yangs were to make a cash down payment of $400,000, which included $20,000 earnest money, $300,000 before closing, and an additional $80,000 at the time the sale closed. In addition to assuming the underlying deed of trust of $1 million held by the United Bank of Alaska (UBA), the Yangs agreed to execute a promissory note to the Yoos in the principal amount of $1,650,000. The agreement was expressly subject to approval by UBA of the assumption by the Yangs of the first deed of trust.

The agreement did not contain any of the language drafted by Mr. Kim designed to protect the Yangs from low revenues. Ac-

cording to the Yangs, they tried to incorporate such language into the agreement, but Zong convinced them that the strong ties of trust which bind Korean nationals made such a request improper.

The Yangs paid the Yoos $120,000, sold their Los Angeles house, removed their daughter from school, and moved to Anchorage for the anticipated closing in February.

A "due on sale" clause in the UBA deed of trust prevented the Yangs from assuming it. However, First Federal Bank agreed to refinance the UBA note. The Yangs borrowed $1 million from First Federal and simultaneously applied for a Small Business Administration (SBA) loan which would pay the First Federal loan down to $375,000.

The closing occurred on February 18, 1986, at which time the Yangs paid the Yoos $87,741.52. Previously the Yangs had paid the Yoos $200,000 in addition to the $120,000 payment. Thus, the Yangs had paid a total of $407,741.52 to the Yoos by the closing date. This amount represented the $400,000 down payment plus half of the loan and escrow fees. The Yangs were to make monthly payments to the Yoos of $17,881.40.

The SBA loan was approved and closed on May 9, 1986. Since the Yoos agreed at closing to subordinate their lien position to the SBA loan, this left the Yangs in debt to the following parties in the respective positions of priority: First Federal ($375,000), SBA ($625,000), and the Yoos ($1.65 million).

The $375,000 owed to First Federal was due October 1, 1986. The $625,000 owed to the SBA was due over fifteen years. The Yoos had agreed that on October 1, 1986, they would pay $125,000 of the amount due to First Federal and the Yangs would pay $250,000 of this sum. The portion paid by the Yoos would then be added to the principal balance of the Yoo–Yang note.

By August 1986, it became evident to the Yangs that revenues would not approach the guaranteed amount of $1 million. They requested return of their down payment, but were refused. It also became apparent that the $375,000 obligation due First Federal could not be met. The Yoos had not tendered the promised $125,000, and lack of revenues from the Inlet Inn precluded the Yangs from making their balloon payment of $250,000.

In October the Yangs again requested the Yoos to return their down payment and take back the hotel. The Yoos refused. In order to avoid foreclosure by First Federal, the Yangs negotiated a loan modification agreement with the bank in which the $375,000 would be paid as follows: $175,000 due on October 30, 1987; $100,000 on October 30, 1988; and $100,000 on October 30, 1989. Both the Yoos and the Yangs, as well as First Federal, signed this loan modification agreement.

On October 23, 1986, the Yoos and the Yangs signed two agreements between themselves. In one document, the Yoos agreed to pay $125,000 of the sum due to First Federal on October 30, 1987. The Yangs were to pay the remaining $50,000. The $125,000 paid by the Yoos would then be added to the amount the Yangs owed the Yoos. The second document provided that the monthly payments the Yangs owed the Yoos would remain at $17,881.21 and would increase to $19,235.80 only when the Yoos paid the $125,000 to First Federal.

In April 1987 the Yangs stopped making payments to the Yoos. At this point, the Yangs had paid the Yoos $246,336.94 in addition to the initial $400,000 down payment. The Yangs did not respond to a written notice sent by the Yoos. On July 14, 1987, the Yoos sued in an attempt to convert their note to a judgment and to judicially foreclose on the underlying deed of trust. The Yoos also filed a Motion to Enter and Take Possession of the Property, but the court denied it. The Yoos obtained a protective order preventing any information relating to this motion and its denial from being presented to the jury.

The Yangs filed an answer to the Yoos' complaint and a counterclaim alleging that the Yoos had breached an oral side agreement to take back the hotel and refund the down payment on October 1, 1986, if the

revenues for the year after the closing did not equal or exceed $1 million. The Yangs filed affidavits by their attorney, William Artus, and by the Inlet Inn's manager, Myung Ho Won, stating that Zong confirmed the existence of such an oral agreement at a meeting in Artus's office on July 15, 1987. Artus had prepared an affidavit relating to Zong's statements for Zong to sign. Apparently Zong confirmed that the contents of the affidavit were true, but he refused to sign it.

The parties attempted to settle their disagreement. In October 1987 the Yangs filed a separate lawsuit claiming that the Yoos had breached a settlement agreement. The proceedings in the foreclosure action were stayed, but the Yangs made no attempt to pursue their action concerning the settlement agreement. The court approved a stipulated agreement in the Yangs' separate action and reinstated this foreclosure action.

On October 7, 1988, the Yoos moved for summary judgment seeking an order establishing personal liability on the note and a decree of foreclosure. Judge Rene J. Gonzalez denied the motion.

A jury trial began on January 31, 1989, and concluded on February 13. Because William Artus was unavailable, his testimony was presented by videotape deposition. The deposition was conducted during the course of the trial. During cross-examination of Artus, the Yoos offered into evidence the affidavit of Myung Ho Won describing the meeting with Zong at Artus's office. The Yangs did not object to admission of this document. Apparently, as the result of a clerical error during playback of the videotape to the jury, the in-court deputy did not note the offer of the affidavit on the court's exhibit list. At the time the exhibits were being gathered for submission to the jury, the Yoos did not recall offering Won's affidavit into evidence. Won had not been called at trial. Because Won did not testify and Artus did not deny the statements with which he was confronted that were contained in Won's affidavit, the trial judge refused to submit Won's affidavit to the jury.

On the jury's final day of deliberation, the jury sent the following note to Judge Gonzalez:

> The jury has arrived at part VI"A," and is uncertain as to what to put in the blanks. Is Yes or No appropriate? Is Instruction # 35 appropriate at this stage? [1]

Over objection of both counsel, the court responded as follows:

> In part VI of the Verdict Form, identify the prevailing party by using a check mark in the appropriate space. Instruction # 35 is appropriate. The concept of rescission and its purpose is to return the parties to their position before the contract was made.

The jury reached a verdict, finding that the Yangs had failed to comply with the terms of the deed of trust note and that they were not legally excused from doing so. The jury found in favor of the Yoos on their claim for judicial foreclosure, but did not award the Yoos any damages.

Judge Gonzalez entered final judgment in favor of the Yoos. The judgment ordered foreclosure of the Yoos' deed of trust and sale of the Inlet Inn. The Yoos were not awarded a deficiency judgment. Judge Gonzalez awarded the Yoos $20,000 in attorney's fees.

The Yangs moved to amend the judgment so that it still provided for foreclosure, but resulted in most of the proceeds going to the Yangs instead of the Yoos. Judge Gonzalez denied this motion. The court also denied the Yangs' motion seeking a stay of proceedings to enforce the judgment. In addition, the Yangs filed a motion for a new trial, or in the alternative for a judgment notwithstanding the

---

1. Part VI(A) of the Special Verdict states:
   Plaintiffs (Yoos) claim for judicial forclosure [sic]:
      Plaintiffs (Yoos) _____
      Defendants (Yangs) _____

   Instruction 35 reads:
   Rescission is a remedy that relieves a purchaser of property from the obligations to the sellers under the contract.

verdict. The court denied this motion on August 7, 1989.

Prior to the scheduled foreclosure sale on May 5, 1989, the Yangs filed bankruptcy. The proceedings in this case were automatically stayed pursuant to 11 U.S.C. § 362, until the United States Bankruptcy Court lifted the stay on June 1, 1989. At that time, the Yoos were able to conduct their foreclosure sale.[2]

The Yangs appeal the judgment and request this court to vacate the foreclosure sale.

## II. DISCUSSION

### A. Did the Trial Court Commit Reversible Error in its Instructions to the Jury Concerning Rescission?

Instruction 35 reads as follows: "Rescission is a remedy that relieves a purchaser of property from the obligations to the sellers under the contract." The Yangs argue that the phrase "under the contract" is a misplaced modifier and incorrectly implies that one can rescind a contract and still enforce it. In addition, the Yangs contend that Judge Gonzalez improperly instructed the jury that rescission could be considered when the jury reached Part VI(A) of the special verdict form. According to the Yangs, the court's instruction led the jury to reach an inconsistent verdict, awarding foreclosure but no damages, to the Yoos.

■ The Yangs admit that they did not object to Instruction 35 at the trial. Generally, we will not consider an assertion that an instruction was erroneous where the matter was not properly brought to the attention of the trial court. We will, however, correct plain errors which are so sub-stantial as to result in injustice. *Merrill v. Faltin*, 430 P.2d 913, 917 (Alaska 1967) (court erroneously instructed jury that plaintiff had burden of proving malice in assault and battery action).

■ While we agree with the Yangs that Instruction 35 was inappropriate when the jury reached Part VI(A) of the verdict form, we do not believe Judge Gonzalez's instructions concerning rescission prejudiced the Yangs. Before they reached Part VI(A), the jury had already concluded that the Yangs were not legally excused from defaulting on their debt to the Yoos.[3] Instruction 38 specifically explained that "the Yangs were excused from keeping their promise" if the jury found that "it is more likely true than not true that the Yoos' promise to return to the Yangs the downpayment they made if the total revenues of the Inlet Inn were not approximately $1,000,000 during the first year of operation, and the revenues of the Inlet Inn in fact were not approximately $1,000,000 during the first year of operation." The jury did not believe an enforceable oral side agreement existed between the Yangs and the Yoos. Therefore, we reject the Yangs' argument that the jury intended to rescind the contract and return the Yangs' down payment and other expenses to them.

### B. Was the Jury's Verdict Inconsistent and Legally Impossible?

The Yangs argue that the verdict is invalid because it awards foreclosure although there is no underlying obligation. According to the Yangs, the jury's award of zero damages to the Yoos means the jury concluded that the Yangs owed nothing to the Yoos. As explained in the preceding section, we reject this interpreta-

---

**2.** According to the Yangs, the Yoos successfully submitted a set-off bid of $1,650,000 for the property at the foreclosure sale.

**3.** PART I of the special verdict asked the following questions and was answered as follows by the jury:
1. It is [sic] more likely than not that the defendants failed to comply with one or more of the terms of the deed of trust and deed of trust note signed on February 18, 1986, in the amount of $1,650,000?

 Yes (Answer yes or no)
2. Is it more likely than not that the defendants were not legally excused from their failure to comply with one or more terms of the deed of trust and deed of trust note of February 18, 1986?

 Yes (Answer yes or no)
If your answer to both questions 1 and 2 is *yes* then you need not answer PART II, PART III, IV AND V, and should go to PART VI and enter Verdict for the Plaintiffs in Part A.

tion. The jury explicitly found that the Yangs had no legal excuse for their failure to pay the Yoos.

■ Admittedly, the jury's answer to the damages question is somewhat puzzling. Given the language of Instruction 40,[4] Judge Gonzalez apparently intended that the jury indicate as damages the amount it believed the Yangs owed the Yoos. Judge Gonzalez should have returned the verdict to the jury with clarifying instructions. His failure to do so, however, is not grounds for amending the verdict or granting a new trial.

■ We will not disturb a jury verdict if there is a theory which reconciles the apparent inconsistencies. This course of action is well supported by cases from other jurisdictions. *See, e.g., Granger v. Fruehauf Corp.*, 429 Mich. 1, 412 N.W.2d 199, 203 (Mich.1987) (in products liability action brought by truck driver injured in fall from trailer, verdicts of negligence but no breach of implied warranty of fitness were not fatally inconsistent in light of manufacturer's intervening resale of trailer to driver's employer); *Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 275 (Minn.1984) ("If the answers to special verdict questions can be reconciled on *any* theory, the verdict will not be disturbed.") (emphasis in original); *City of Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo.1981) (affirmed verdict finding that defendant was negligent but that negligence was not a proximate cause of plaintiff's damages); *Moore v. Burton Lumber & Hardware Co.*, 631 P.2d 865, 869 (Utah 1981) (A jury's answers

to special interrogatories must, if at all possible, be read harmoniously.); *Garcia v. Dependable Shell Core Machines*, 783 S.W.2d 246, 249 (Tex.Ct.App.1989) ("An appellate court may not strike down conflicting jury answers if there is any reasonable basis upon which they may be reconciled."); *Dallas Market Center v. The Swing, Inc.*, 775 S.W.2d 838, 842–43 (Tex.Ct.App.1989) (upheld verdict which found that both parties had breached a lease, but awarded damages to only one of the parties); *Becker v. State Farm Mut. Automobile Ins. Co.*, 416 N.W.2d 906, 913 (Wis.Ct.App.1987) ("An inconsistent verdict is one in which the jury answers are logically repugnant to one another."). *See also, Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment."); 5A Moore's Federal Practice ¶ 49.03[4], at 49–39 to 49–42 (1990).

We believe it is possible to reconcile the jury's award of zero damages with the jury's finding in favor of the Yoos on their foreclosure claim. Concluding that no enforceable oral side agreement existed that would excuse the Yangs' failure to make payments on the deed of trust held by the Yoos, the jury awarded foreclosure to the Yoos. Foreclosure means the property will be sold. The underlying obligation, the

---

4. Instruction 40 states:

In deciding the amount of damages that the defendants must pay to the plaintiffs, if any, you must keep in mind the following rules:

First, that your general goal should be to put the plaintiffs in as good a position as they would have had had the defendants kept their promise. I will explain in a moment how you are to do this.

Second, you must have a reasonable basis for fixing the amount of damages. The plaintiffs are not required to show their damages with mathematical exactness, but you must have a reasonable basis for fixing damages in this case. A mere guess is not enough.

Now I will explain to you how to award damages to the plaintiffs so they will be kept

in as good a position as if the defendants had kept their promises.

The deed of trust note the defendants signed on February 18, 1986, provided that plaintiffs were to receive the sum of $1,650,-000, together with interest at the rate of 11.75% per annum. The deed of trust note provides upon default by defendants in payment of any indebtedness secured by the deed of trust defendants signed on February 18, 1986, or in performance of any agreement in the deed of trust, all sums secured by the deed of trust shall immediately become due and payable at the option of the plaintiffs.

You are instructed that on July 20, 1987, the plaintiffs exercised their option to declare all sums secured immediately due and payable.

$1,650,000 note, essentially becomes a non-recourse obligation. It is enforceable against the property but not against the Yangs personally. This is the theory relied on by Judge Gonzalez. It seems readily defensible from the perspective of an appeal by the Yangs. The instruction on damages told the jury that its "general goal should be to put the plaintiffs in as good a position as they would have had had the defendants kept their promise." The jury might well have concluded that permitting the note to be enforced only against the property through the device of foreclosure adequately accomplished this goal.

The question on the verdict form pertaining to damages seems unnecessary. The Yoos did not request damages in addition to the amount owed under the note. Having awarded foreclosure, there is no reason for the jury to calculate the exact amount owed to the Yoos under the note, since there is no dispute of fact concerning the payments made on the note or the interest due.

This case can be distinguished from *State v. Lewis*, 785 P.2d 24 (Alaska 1990), in which this court reversed and remanded the case because the jury's answers on a special verdict were irreconcilable. *Lewis* involved an inverse condemnation proceeding. The jury found that the remaining property was worth more after taking than the entire parcel had been worth before, but also found that the remaining property received no special benefit from the public improvement resulting from the taking. *Id.* at 27. *See also Massey–Ferguson Credit Corp. v. Orr*, 420 N.W.2d 1, 3 (N.D. 1988) (reversed and remanded special verdict where jury found that there was no agreement between secured creditor and debtor waiving deficiency judgment upon repossession of collateral, but jury awarded creditor no damages); *Continental Assur. Co. v. Davis*, 538 So.2d 542, 544 (Fla.Dist. Ct.App.1989) (setting aside jury's award of compensatory and punitive damages against insurance company and its salesman where jury found that salesman did not deliberately and knowingly misrepresent policies). In *Lewis*, two of the jury's factual findings directly conflicted. In this case, the inconsistency of the verdict is not obvious on its face, but instead depends on reading a certain intent into the verdict answers. Where, as in this case, a plausible theory exists to reconcile the jury's answers on a special verdict form, we will do so.

C. Is the Trial Court's Judgment of Foreclosure Reversible Because it Fails to Specify the Amount Due to the Yoos on the Underlying Debt?

The Yangs offer two reasons why calculation of an exact amount owed is necessary: (1) to determine upon sale whether the Yoos are entitled to a deficiency judgment or whether the Yangs are entitled to a surplus under AS 09.35.110 (made applicable by AS 09.45.180); and (2) to determine the Yang's redemption rights under AS 09.45.190.

We have not previously addressed the issue of whether every judgment for foreclosure must specify an exact amount of the outstanding indebtedness. In this case, we find the calculation of an exact amount by the court unnecessary. The superior court resolved the legal issues concerning the Yangs' obligation to the Yoos; therefore, determining the exact sum of the existing debt is a matter of math, not a matter of law. *See Bank of Honolulu, N.A. v. Anderson*, 3 Haw.App. 545, 654 P.2d 1370, 1374 (1982) ("To be entitled to a decree of foreclosure, the Bank was required to prove Anderson's default. It was not required to prove the exact amount owed under the Agreement until after the confirmation of the foreclosure sale. Consequently, despite lacking the specific amount of indebtedness, the Decree is valid.").

We distinguish this case from *Jones v. North American Acceptance Corp.*, 442 S.W.2d 492 (Tex.Ct.App.1969), in which the trial court ordered foreclosure without resolving the clear dispute regarding the amount of indebtedness owed. In *Jones*, the debtor argued that she promised to pay $2,700 to the creditor for repair of her roof. The Trust Deed and Contract for Labor

and Materials, however, called for a payment of $4,099.26. In *Jones*, the appellate court appropriately invalidated the foreclosure decree for uncertainty because the trial court left critical legal issues unresolved.

D. Did the Trial Court Commit Reversible Error in Failing to Admit the Affidavit of Myung Ho Won?

In his affidavit, Won states that Zong, the Yoos' real estate broker, explained to the Yangs' attorney that he had in fact represented to the Yangs prior to their purchase of the Inlet Inn that the Yoos would rescind the purchase agreement if the Inn's revenues did not exceed a certain level. Apparently the Yoos offered Won's affidavit during cross-examination of the Yangs' attorney, William Artus. The court deputy, however, failed to list the affidavit on the court's exhibit list. Judge Gonzalez refused to admit the affidavit when the Yangs offered it later, i.e., after they had rested their case.

The standard of review of the trial court's admission or exclusion of evidence is abuse of discretion. *Hutchins v. Schwartz*, 724 P.2d 1194, 1197 (Alaska 1986). Although the Yoos were mistaken when they denied having offered the affidavit into evidence, this does not excuse the Yangs' own failure to ensure that essential evidence was in fact admitted by the court. At the time the videotaped cross-examination of Artus was played back in court, the Yangs could have confirmed that the court listed Won's affidavit on the list of exhibits. In addition, the Yangs had sufficient opportunity to call Won as a witness and introduce his affidavit at that time. Instead, the Yangs waited until after the close of evidence to raise the issue. Given the circumstances in this case, we do not believe that Judge Gonzalez abused his discretion in excluding Won's affidavit.

### III. CONCLUSION

While the Yangs correctly identify some irregularities in the trial proceedings, we conclude that the verdict is not irreconcilable and that the judgment is not fatally defective. Therefore, we AFFIRM.