Connie ADAMSON, Appellant,

v.

UNIVERSITY OF ALASKA, Appellee.

No. S–3937.

Supreme Court of Alaska.

Nov. 1, 1991.

Charles Coe, Anchorage, for appellant.

Shelby L. Nuenke–Davison, Davison & Davison, Inc., Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Adamson, a workers' compensation claimant, appeals a denial of various benefits by the Alaska Workers' Compensation Board ("Board"), as affirmed by the superior court.

## FACTS AND PROCEEDINGS

On August 17, 1984, Connie Adamson, a thirty-three year old library clerk at the University of Alaska, was poked in the ribs from behind by a co-employee and fell down three steps, severely twisting her left ankle. She filed a workers' compensation claim on August 29, 1984, which the University did not controvert.

Adamson's condition has been diagnosed as sympathetic dystrophy and causalgia. Adamson has seen many doctors concerning the injury. One estimate is that she has seen approximately twenty health care providers. Her treatment has included a tarsal tunnel release, pain medicine, acupuncture, a brief attendance at a Pain Clinic in Oregon, physical therapy, a lumbar sympathectomy, chiropractic treatment, and self-hypnosis. Unfortunately, Adamson continues to complain of pain.

After Adamson's lumbar sympathectomy on October 25, 1985, Dr. Horning released her for work as a full-time bookkeeper. Dr. Horning, a physician specializing in rehabilitation medicine, was recommended by Adamson's podiatrist and has attended Adamson since December 17, 1984. Dr. Horning filled out a physical capacities evaluation worksheet for Adamson on July 31, 1986, placing no restrictions on the listed activities.

Adamson ceased receiving temporary total compensation benefits at the end of July 1986, based upon the release for work, and from August 1986 to September 1987, she received permanent partial compensation for her lower left foot and ankle.[1]

---

1. Adamson received temporary total disability benefits from August 18, 1984 through September 2, 1984, from September 7, 1984 through October 7, 1984, from December 4, 1984 through June 10, 1985, and from July 16, 1985 through July 31, 1986. Permanent partial dis-

Adamson claims her condition improved until October 1986; then she returned to Dr. Horning complaining of pain. Yet, Dr. Horning found nothing which would offer an objective explanation of her pain. In December 1986, Adamson began seeing Dr. Lucas, a chiropractor, for the pain in her foot, leg, and back. Dr. Lucas attributed the pain in Adamson's back to her abnormal gait. Dr. Lucas diagnosed her as having acute severe rotary subluxation sprain/strain of the lumbar spine with associated myalgia and left extension neuralgia. Adamson also began seeing Dr. Schurig at Dr. Lucas' recommendation. Dr. Schurig first prescribed marijuana for Adamson and then Marinol, a marijuana derivative. The University controverted the payments to Dr. Lucas and Dr. Schurig and the payments for the Marinol.

On May 13, 1987, Adamson applied for an adjustment of her claim and the University opposed it. A hearing was held on October 16, 1987. Approximately half-way through the hearing, a settlement was reached and read into the record.

The University reduced the settlement to a fifty-four page document. Adamson refused to sign it, claiming it portrayed her as a malingerer, it did not accurately reflect the oral agreement, and it limited her medical care.

The University petitioned the Board to enforce the oral agreement. Adamson changed counsel and a hearing was held. The Board declined to reduce the settlement to judgment; it decided to continue the original hearing where it had left off, without taking additional evidence beyond that which the parties would have presented at the first hearing. It denied Adamson's request for attorney's fees, preferring to "wait and see whether the employee ultimately prevails in her claim and, if so, to what extent the recovery exceeds the terms of the offered oral agreement."

The hearing reconvened on August 31, 1988. After allowing the parties to complete their presentations, the Board held that Adamson was not entitled to continuing temporary total disability benefits ("TTD"), a reclassification of the past permanent partial disability ("PPD") benefits as TTD, or a determination that her back pain was related to her leg injury. It declined to authorize continuing chiropractic care for her back or her left foot; it also declined to authorize the use of Marinol. Finding for the University, it denied an award of attorney's fees for Adamson under AS 23.30.145.

Adamson appealed to the superior court, which affirmed the Board's decision. Adamson appeals.

## DISCUSSION

### I. DID THE BOARD ERR IN EXCLUDING RELEVANT EVIDENCE AT THE AUGUST 31 HEARING?

The Board halted the first hearing on October 16, 1987 when the parties indicated they wanted to settle. Although an oral agreement was entered on the record, Adamson refused to sign the written version of the settlement as it "limited her medical care, as well as contained slanderous and incorrect material." The University petitioned to have the settlement reduced to judgment, which the Board declined to do.

The Board decided to continue the hearing on the underlying claims, yet it refused to consider any evidence concerning events subsequent to the original hearing date, including witnesses not listed at the October 1987 hearing. In this regard, the Board stated,

While we reiterate our belief that we have no choice but to conclude as we have under AS 23.30.012, we need to take steps to minimize the potential turmoil where an oral agreement does not ultimately settle a claim. Our primary concerns are the additional administrative burden imposed by starting hearings over after months have gone by and avoiding changed conditions. The closer

ability payments were made from June 11, 1985 through July 15, 1985 and from August 1, 1986 through September 7, 1987. Total compensation payments have exceeded $40,000. The Uni-

versity has paid benefits for Adamson's health care, vocational rehabilitation, temporary total disability, and permanent partial disability.

we come to starting a "new" hearing, the more likely one party may be perceived to have obtained an advantage. We need to avoid the perception that a "tactical" oral agreement is an option at hearing. The superior court affirmed this exclusion of evidence, citing AS 23.30.135(a).[2]

Adamson argues that the Board's approach was a sanction that denied her a fair hearing consistent with due process.[3] The University claims that the Board was within its discretion in controlling its own proceedings, and its decision was good policy. However, the University also argues that even if the Board erred, it was harmless error. The University claims that Adamson failed to object to the Board's rulings at the hearing, she failed to make an offer of proof, and her physical condition had not changed from October 16, 1987.

■ We affirm the Board's decision.[4] Adamson's failure to make an offer of proof is fatal to her claim of alleged error.

Evidence Rule 103(a)(2) states,

(a) **Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

. . . .

(2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

The commentary accompanying the Evidence Rules explains, "If the ruling is to exclude evidence, the substance of the offered evidence must be made known to the court in order to ascertain on appeal whether a substantial right has been affected." Alaska R.Evid. 103(a) Commentary. In the absence of an offer of proof, there is no showing that it was prejudicial to refuse to admit the excluded evidence. *Mac-Rich Realty Constr., Inc. v. Planning Bd. of Southborough,* 4 Mass.App. 79, 341 N.E.2d 916, 921 n. 9 (1976). 1 J. Wigmore, *Wigmore on Evidence* § 20a, at 858 (Tillers rev. 1983). The failure to make such an offer precludes appellate review. *Illenden v. Illenden,* 46 Mich.App. 710, 208 N.W.2d 565, 567–68 (1973); *Commonwealth v. Chapman,* 345 Mass. 251, 186 N.E.2d 818, 821–22 (1962). It constitutes waiver of the claim of error. *People v. Demond,* 59 Cal. App.3d 574, 130 Cal.Rptr. 590, 598 (1976); *Loveland v. State,* 53 Ariz. 131, 86 P.2d 942, 943 (1939).

Professor Wigmore has explained the reason for this requirement:

The requirement of an offer, when applicable, serves to promote justice and conserve resources because it tends to reduce the frequency of unnecessary reversals and retrials. Furthermore, the re-

---

2. AS 23.30.135(a) states, in part,
 **Procedure before the board.** In making an investigation or inquiry or conducting a hearing the board is not bound by common law or statutory rules of evidence or by technical or formal rules of procedure, except as provided by this chapter. The board may make its investigation or inquiry or conduct its hearing in the manner by which it may best ascertain the rights of the parties.

3. We view Adamson's appeal of the Board's exclusion of evidence as a question of whether the Board abused its discretion. This is the crux of her argument. Adamson mentions due process only in passing in her opening brief, although it is given more attention in the reply brief. Yet, where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal. *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980); *Fairview Development, Inc. v. City of*

Fairbanks, 475 P.2d 35, 36 (Alaska 1970), *cert. denied,* 402 U.S. 901, 91 S.Ct. 1374, 28 L.Ed.2d 642 (1971). Such a waiver is not correctable by arguing the issue in a reply brief. *Hitt v. J.B. Coghill, Inc.,* 641 P.2d 211, 213 n. 4 (Alaska 1982).

Moreover, we reject Adamson's contention that she was "sanctioned" by the Board for not signing the Compromise and Release. The Board, in fact, found the exercise of Adamson's statutory right not "frivolous, unreasonable or in bad faith."

4. Our decision is limited to the case at bar. We do not intend to imply approval of a policy of excluding relevant evidence in circumstances where the hearing is continued because of a failed settlement. On the contrary, we have grave reservations concerning any such policy, given the purposes of the Workers' Compensation Act.

quirement of an offer serves as a pro- phylaxis against a danger that arises from the adversary and partisan charac- ter of the trial process in America. Trial lawyers may (and, in our experience, sometimes do) make offers of non- existent evidence with the hope of estab- lishing a basis for appeal when they ex- pect that the trial court will make an erroneous ruling that the (nonexistent) evidence will not be admitted. If law- yers were relieved of the obligation to make an offer of proof after an adverse ruling on an offer of evidence, the num- ber of attempts to introduce nonexistent evidence would surely increase greatly, at least in America.

*Wigmore on Evidence, supra,* § 20a, at 866 (footnote omitted). The rule also but- tresses the principle that it is the appel- lant's burden to convince us that the Board's decision to exclude the evidence was in fact prejudicial and not harmless.[5]

In the case at bar, Adamson's attorney did not make an adequate offer of proof.

Although an offer may be informal, it must still be informative, and sufficiently so. Thus, an informal offer must be "definite," "specific," and "intelligible" and cannot be "vague," "general," or "indefinite;" it must "clearly state" what a party intends to prove and cannot state "mere conclusions."

*Wigmore on Evidence, supra,* § 20a, at 870 (footnote omitted). While Adamson's attorney discussed generally what witness- es might be called and what they might say, the Board already had reports by these doctors before it. There was no indi- cation of new evidence whose exclusion would have prejudiced Adamson.[6]

Our determination that the exclusion of further evidence did not prejudice Adamson is fortified by Adamson's testimony. She testified that her condition had not changed from October 16, 1987. When asked, "What is your condition now compared to October 16, 1987?" she stated,

Basically, it's the same. I'm still having the same problems now that I was hav- ing then.

I'm still affected by the weather, I still have the spikes and I still have the swell- ing, I have the numbness the—the pains—basically everything is the way it was before.

## II. DID THE BOARD ERR IN CHARAC- TERIZING TTD AS PPD AND IN FAILING TO APPLY THE PRE- SUMPTION OF COMPENSABILITY TO ADAMSON'S CONTINUING TTD CLAIMS?

The University recharacterized Adam- son's TTD benefits from August 1986 until September 7, 1987 as PPD payments and halted further compensation. Adamson asked the Board to reclassify those pay- ments as TTD and award continuing TTD benefits from September 7, 1987 to the present. The question, therefore, whether TTD should have been discontinued, goes back to the "recharacterization" of Adam- son's benefits in August 1986.

Adamson first contends that the employ- er and the Board erred by focusing on her maximum physical recovery rather than her ability to return to work. We find this argument meritless. The Board did look at Adamson's employability, finding that Adamson could return to work full-time in July 1986.

---

**5.** We recognize that the Board is not bound by the statutory rules of evidence or by technical or formal rules of procedure. *See* AS 23.30.- 135(a) and 8 AAC 45.120(e). Nevertheless, if appellate review is to be meaningful, a party asserting error in proceedings before the board must, by making an offer of proof or other appropriate procedural means, afford the appel- late tribunal a means of evaluating the claims of error.

**6.** While a report by a Dr. Alberts was not admit- ted at the hearing, the content of the report was made known to the Board. This report would not have constituted substantial evidence to sup- port a different conclusion. *Black v. Universal Servs., Inc.,* 627 P.2d 1073, 1075 (Alaska 1981). The report indicated that in October 1985, there was no evidence of hysterical conversion or psychosomatic explanation for Adamson's con- stant pain. Yet, at the August 1988 hearing, numerous doctors described Adamson as a hy- pochondriac.

■ Adamson also alleges that the Board failed to apply the presumption of compensability to her claim for continuing TTD after September 7, 1987. We find that the Board erred in its failure to apply the presumption. The Board stated that the employee "bears the burden of proving whether or not he is disabled and the nature and extent of the disability." It then assessed whether Adamson had proved she was temporarily totally disabled after July 1, 1986. In *Wien Air Alaska v. Kramer*, 807 P.2d 471, 473–74 (Alaska 1991), we held that the statutory presumption applies to a worker's burden of production in establishing that he or she suffered from a continuing disability.

■ However, after a review of the record, we find that the Board's error was harmless. *See Kodiak Oilfield Haulers v. Adams*, 777 P.2d 1145, 1150 (Alaska 1989). The presumption shifts only the burden of production and once the employer rebuts the presumption with substantial evidence, the presumption drops out and the employee must establish each element of the claim by a preponderance of the evidence. *See, e.g., Veco, Inc. v. Wolfer*, 693 P.2d 865, 869–70 (Alaska 1985). The University produced substantial evidence to rebut the presumption. The Board stated,

> We find, based on the evidence we summarized previously, that the employee could have returned to work full-time in July 1986. We credit Dr. Horning's testimony, over that of Drs. Lucas and Schurig, for several reasons. Dr. Horning is a certified expert in rehabilitation medicine. His treatment began much closer to the employee's injury date than that of Drs. Lucas and Schurig. He also obtained a much fuller understanding of the employee's condition and complaints through review of her medical records and consultation with her other treating physicians. He concluded that the em-

ployee's worsened condition in October 1986 represented a "flurry of pain behavior" brought about by the impending need to return to work rather than a bona fide deterioration of her condition. We find therefore, that the employee's ability to return to work in July 1986 ended her entitlement to receive temporary total disability compensation.

(Footnote omitted.)

■ The evidence in the record amply supports the Board's conclusion.[7] Adamson was released for regular work as early as November 9, 1984 by Dr. Waldroup. Dr. Seres testified that Adamson said in March of 1985 that she could return to work as a research librarian at that time. From a medical standpoint, Dr. Seres felt that Adamson was capable of doing her job; from a medical and psychological standpoint, Drs. Seres, Yospe, and Kramer thought it was in her best interest to do so. Dr. Hein concurred with Dr. Horning's advice on January 23, 1986, that Adamson's best therapy would be exercise and to be as active as possible. On July 31, 1986, Dr. Horning felt that she could return to work as a reference librarian assistant. Dr. Horning reiterated Adamson's need to return to work in October 1986, after she returned complaining of pain.

By April 16, 1986, Adamson was walking up to three hours a day and biking 20 miles in 45 minutes on a stationary bike. In May 1986, she said she could handle returning to her job at Personal Page on a full-time basis. By July 1986, she played badminton for two hours. On July 31, 1986, Dr. Horning fully released her for work noting Adamson was capable of sitting eight hours, standing seven, walking five to six hours during a normal workday, as well as bending and twisting frequently, squatting, climbing, and crawling occasionally, lifting ten pounds continuously, and lifting up to 35 pounds frequently. He repeated this in

---

7. Where the superior court functions as an intermediate court of appeals, we independently review the Board's findings of fact. *See Burgess Constr. Co. v. Smallwood*, 698 P.2d 1206, 1210 (Alaska 1985). We review the Board's factual findings to determine whether they are supported by "substantial evidence." In making this determination, we do not reweigh conflicting evidence. *Fairbanks North Star Borough School Dist. v. Crider*, 736 P.2d 770, 773 (Alaska 1987) ("The court need only find 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (citation omitted)).

August 27, 1987, and at his deposition on October 12, 1987. Adamson argues that her improvement was a temporary result of the sympathectomy operation, and therefore Dr. Horning's testimony should be discounted.[8] Dr. Horning's consistent diagnosis that Adamson could return to work, even years after that operation, indicates the improvement was not temporary. Finally, it was for the Board to weigh the credibility of the witnesses. *See* AS 23.30.-122. Based on our review of the record, we affirm the Board's decision on the TTD benefits.

III. DID THE BOARD ERR IN FAILING TO APPLY THE PRESUMPTION OF COMPENSABILITY TO ADAMSON'S BACK CONDITION AND IN RELYING ON DR. SERES' TESTIMONY TO DENY COVERAGE FOR THE CONDITION?

Adamson claims that the Board made no finding as to whether the leg and back condition were interrelated; she also argues that it is "uncertain" whether the Board properly applied the presumption of compensability. Adamson also claims that the reliance on Dr. Seres' testimony to rebut the presumption was error as he never treated her back.

The University argues that the back complaint did not arise out of or in the course of the employment with the University. It claims the Board properly applied the presumption of compensability, finding substantial evidence that the back injury, if it existed, was not work-related. We affirm the Board on its denial of coverage for Adamson's back injury.

The presumption in AS 23.30.120(a) is used most often to establish work-relatedness. *See, e.g., Thornton v. Alaska Workmen's Compensation Bd.,* 411 P.2d 209, 211 (Alaska 1966). In the case at bar, the

Board discussed the presumption at length, correctly stating it and its implication for Adamson. It noted that the presumption drops out if there is substantial evidence that the claim is not work-connected. *Veco,* 693 P.2d at 870.

The Board found that a preliminary link was established between the low back condition and employment. Yet, the Board found that substantial evidence existed that the back injury was not work-related.[9] "We find the testimony of Drs. Horning, Seres, and Yospe substantial evidence that the back injury, if any, is not work-related." It continued,

We find a preponderance of the evidence favors the employer. Dr. Lucas, and Dr. Schurig to a lesser extent, related the employee's back complaints to a gait problem arising from the 1984 injury. However, neither saw the employee until over two years after the 1984 injury and neither had reviewed much of the prior medical records. Both believed a gait problem could aggravate her congenital L5 vertebral sacralization. However, the testimony of the employee and Dr. Horning reveal gait changes existed in varying degrees, without back complaints, for over two years before Dr. Lucas' December 1986 examination. The employee herself related her back complaints to the sympathectomy, although Dr. Horning testified there is no correlation between them. We conclude, based on Dr. Hornings [sic] testimony and the long period between the 1984 injury and the employee's initial low back complaint, that the low back condition is not related to the 1984 injury and is not compensable.

Ample evidence exists to support the Board's conclusion. Dr. Horning examined Adamson's back in December 1984, October 1986, and August 1987, finding no

---

8. On October 12, 1987, she reported to Dr. Schurig that "[s]he cannot walk on concrete or stairs. She cannot squat, bend over, kneel or perform vacuuming, sweeping or mopping type activities.... She reports it would be difficult to do secretarial type work because she would have to prop her leg up most of the time."

9. As the Board noted, there are two ways by which the presumption of compensability can be overcome in relation to work-relatedness: affirmative evidence that the injury was not work-related, or elimination of all reasonable possibilities that the injury was work-connected. *See, e.g., Burgess,* 698 P.2d at 1211.

problem. While Adamson did not have low back pain until after the lumbar sympathectomy, Dr. Horning stated that the lumbar sympathectomy surgery could have no relationship to back pain. Although Dr. Horning also noticed "the slightest limp," he believed the lower back pain was unrelated to the job injury and noted symptom magnification.

■ The testimony of the doctors support Dr. Horning's conclusions. Dr. Kramer found Adamson's back to be fine in March 1985. Dr. Hein noted no significant limp in February 1986 and May 1986. Even Dr. Lucas found the range of motion for her back normal. And Dr. Schurig testified that while Adamson had degenerative disc disease, he did not relate it to her foot injury or make any relationship between her back and her foot. On redirect, he said the back pain may be due to her gait, but he had not formed an opinion as to whether, alternatively, degenerative disc disease was causing the problem. While the doctors at the Northwest Pain Clinic, Drs. Seres, Yospe, and Kramer, may not have examined Adamson extensively, the Board did not give their testimony unreasonable weight given the other evidence, including Dr. Horning's own conclusions.[10]

As far as Drs. Lucas and Schurig, the Board found that neither doctor saw Adamson until two years after the 1984 injury, nor had either reviewed much of the prior medical records. Dr. Lucas never viewed earlier x-rays or looked at prior medical records. Dr. Schurig only saw Adamson twice, and many evaluative tests for her back were never done. He reviewed no medical history for her prior to 1984, yet that medical history indicates that Adamson was in a car accident in 1982 and received whiplash. Moreover, Adamson's own testimony indicated that gait changes existed in varying degrees without back complaints before the lumbar sympathectomy. Given the Board's power to credit some witnesses and not others, see AS 23.-30.122, we affirm its finding.

## IV. DID THE BOARD ERR IN FAILING TO AWARD COMPENSATION FOR MEDICAL EXPENSES?

Adamson sought continued compensation for chiropractic treatment for her lower back condition, her foot, and reimbursement payment for her Marinol prescription. Adamson claims that the Board erred in failing to extend the time limit for compensation of medical expenses two years from the date of discovery of the latent back condition. She also claims the Board erred in not applying the presumption of compensability for medical expenses requested beyond the two year period mandated by AS 23.30.095.[11]

The University argues that continued treatment or care is in the Board's discretion, pursuant to AS 23.30.095(a). More-

10. Adamson cites *Black v. Universal Servs., Inc.*, 627 P.2d 1073 (Alaska 1981), for the proposition that this court should not credit the testimony of Drs. Yospe and Seres because they saw her only for a short period of time. In *Black*, however, the doctor interviewed the patient only twenty minutes and the evidence was contrary to numerous physicians who treated her. *Id.* at 1075 n. 9. Here the examination was much more extensive. Dr. Yospe saw Adamson separately from Drs. Seres and Kramer. He reviewed all the records sent by her physicians and insurance carrier and then saw her for an hour. He also conducted a Minnesota Multiphasic Personality Inventory. After Dr. Kramer's examination, Dr. Seres chaired a discussion with her and the other two doctors on issues that presented themselves. Dr. Seres also saw her several days later, and conducted a thermography. Overall, these doctors
 thought that she had a basic underlying hysterical personality structure. That means a person tending to overreact to physical things that would go on, and reacting to them in a very negative way. Instead of looking for ways of getting better, a person like this would be an individual who would tend to augment their complaints ... and use the complaints as a way of avoiding, actually, appropriate therapies.
 ... We felt that she did have elements of ... an hysterical conversion reaction type of thing. This is a type of reaction where there are secondary benefits or secondary gains that occur as a result of the behaviors and the complaints that a person has.

11. AS 23.30.095 was amended in 1988. However, those amendments only apply to injuries incurred after July 1, 1988. As Adamson's injury occurred in 1984, the old version of the statute applies.

over, it claims that substantial evidence exists to support the Board's position, even if the presumption should have been applied.

The Board rejected the claim for chiropractic treatment for the back condition as the back condition was not work-related. As this finding was supported by substantial evidence, we affirm.

 The Board also found chiropractic treatment for Adamson's foot was not reasonable or necessary. The Board did not apply the presumption of compensability to Adamson's claim for continuing chiropractic care. It said, "Employee has the burden of proving the need for the treatment by a preponderance of the evidence."

 Failure to apply the presumption was error. In *Municipality of Anchorage v. Carter*, 818 P.2d 661 at 665 (Alaska 1991), we held that the presumption applies to a claim for continuing treatment or care. However, the University argues the failure to apply the presumption was harmless error as substantial evidence exists to support the Board's position. We disagree.

The Board said,

We find the employee's left foot and leg are affected by residual reflex sympathetic dystrophy. Drs. Horning and Seres testified the employee needs to use and exercise the leg to improve her condition. Dr. Lucas testified he obtained some improvement of the employee's condition by adjusting her navicular bone. Based on the failure to substantially improve the employee's condition, and Drs. Horning and Seres' testimony concerning treatment of sympathetic dystrophy, we find chiropractic treatment is not reasonable or necessary.

However, evidence existed that the chiropractic treatment reduced Adamson's pain. After several months of treatment, she still felt severe pain at times but was much more comfortable since the treatment began. While the care might not be reasonable and necessary to improve her leg physically, it did reduce the pain and applying the presumption may have led the Board to a different result. In light of *Carter*, where we acknowledged the right to continuing medical care for palliative treatment, a remand is necessary as to the issue of chiropractic treatment for Adamson's foot.

 Similarly, a remand is necessary to apply the presumption to Adamson's claim for reimbursement for her Marinol prescription.[12] As to the prescription for Marinol, the Board said,

As an expert to pain treatment, we rely on Dr. Seres' testimony concerning the reasonableness and necessity of using Marinol for treating chronic pain over that of Dr. Schurig. Dr. Seres' testimony is also consistent with Dr. Horning's testimony that use of any pain medication over a long period of time would not help the employee. We also find that despite contrary advice from Dr. Seres and Dr. Horning against use of pain medications, the employee chose to approach Dr. Schurig for prescription of marijuana and Marinol. We find by a preponderance of the evidence that the Marinol prescription was not reasonable or necessary. The employee's claim for reimbursement of the costs of the Marinol prescription is denied and dismissed.

We note, however, that Adamson was seeking palliative care. Her doctor, Dr. Schurig, prescribed Marinol for her in October 1987. While he had only one visit with Adamson, and he had doubts about the prescription's long term use, a lay person cannot be expected to second guess a doctor's recommendation for care. While the Board could reasonably rely on Dr. Seres, a neurosurgeon, and his testimony that Mari-

12. In *Municipality of Anchorage v. Carter*, 818 P.2d 661 at 665 (Alaska 1991) we said:

the Board retains discretion not to award continued care or treatment or to authorize care or treatment different from that specifically requested based on the requirements demonstrated either by the employee's raised and unrebutted presumption, or by the preponderance of the evidence, as further informed in each case by the "Board's experience, judgment, observations, unique or peculiar facts of the case, and inferences drawn from all of the above." *Kodiak Oilfield Haulers,* 777 P.2d at 1151.

nol is an inappropriate painkiller other than for cancer, in denying an award for continuing treatment with Marinol, Adamson's claim was for reimbursement.

## V. DID THE BOARD ERR IN FAILING TO AWARD ATTORNEY'S FEES TO ADAMSON AS THE PREVAILING PARTY REGARDING THE EMPLOYER'S PETITION TO ENFORCE SETTLEMENT?

 Adamson claims that she was erroneously denied attorney's fees pursuant to AS 23.30.145(b) for the second hearing; there the Board rejected the employer's claim to enforce the oral settlement. The Board awarded fees to neither, preferring to wait and see if Adamson ultimately prevailed and if so, to what extend her recovery exceeded the terms of the oral agreement. After the conclusion of the third hearing it explained,

> We denied the employee's claim for compensation and medical benefits. Consequently, we find the employee's attorney did not successfully prosecute her claim as required for award of attorney's fees under AS 23.30.145. We also find that the employer originally agreed to pay the employee $7,500 plus certain medical benefits. We find the employee's attorney's "success" in obtaining an opportunity to finish the continued hearing over the employer's efforts to enforce the settlement, only to have the claim denied in its entirety, does not amount to success in prosecuting a claim "otherwise resist[ed]" by the employer for purposes of an award of attorney's fees under AS 23.30.145(b).

Alaska Statute 23.30.145(b) states that "if the claimant has employed an attorney in the successful prosecution of the claim, the board shall make an award to reimburse the claimant for the costs in the proceedings...." This language makes it clear that the employee must be successful on the claim itself, not on a collateral issue. Cf. Hutchins v. Schwartz, 724 P.2d 1194, 1204 (Alaska 1986) ("Prevailing party status [for Civil Rule 82] does not automatically follow if the party receives an affirmative recovery but rather it is based upon which party prevails on the main issues.") The word "proceedings" also indicates that the Board should look at who ultimately is successful on the claim, as opposed to who prevails at each proceeding.

Given Adamson's success on appeal of her claim for chiropractic care for her foot, we remand for a redetermination of attorney's fees by the Board.

AFFIRMED, in part, REVERSED, in part, and REMANDED to the superior court for remand to the Board for proceedings consistent with this opinion.

COMPTON, J., with whom MOORE, J., joins, concurring.

COMPTON, Justice, with whom MOORE, Justice, joins, concurring.

With the exception of the court's language noted below, I agree with the opinion. However, the language is as wrong as it is irrelevant, and should not be read uncritically.

Contrary to the court's broad assertion on p. 894 that "[i]n Municipality of Anchorage v. Carter ... we held that the presumption [of compensability] applies to a claim for continuing treatment or care," the court held only that "in the absence of substantial evidence to the contrary this presumption [of compensability] will satisfy the employee's burden of proof as to whether continued treatment or care is medically indicated." Municipality of Anchorage v. Carter, 818 P.2d 661, at 665 (Alaska 1991). To presume that a claim for continuing treatment or care is compensable is quite different from presuming that continued treatment or care is medically indicated. Carter addressed only the latter proposition, not the former. Moreover, no factual issue of whether any treatment or care was medically indicated was raised in this case. Thus this irrelevant discussion may tend to confuse the law of presumptive compensability rather than simply restate it.

What is relevant is that the Board failed to recognize that palliative treatment or care may be compensable in itself. This is a question of law in the first instance, not

of fact. For this reason a remand is necessary. The Board must now apply the law as set forth in *Carter* to the facts.