Eugene SULKOSKY, Appellant,

v.

MORRISON–KNUDSEN, and Aetna
Casualty & Surety Co.,
Appellees.

No. S–6317.

Supreme Court of Alaska.

June 28, 1996.

Paul M. Hoffman, Robertson, Monagle & Eastaugh, Juneau, for Appellant.

Michael A. Barcott, Faulkner, Banfield, Doogan & Holmes, Seattle, Washington, for Appellees.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J. pro tem.*

*OPINION*

PER CURIAM.

Eugene Sulkosky appeals from the superior court's affirmance of the Workers' Compensation Board's order modifying his status from that of permanent total disability to permanent partial disability and denying his request for attorney's fees. On the basis of our review of the record, we conclude that the Superior Court's affirmance of the Board's decision should be affirmed. In reaching this conclusion we are in agreement with, and adopt, the opinion entered in this case by Thomas M. Jahnke, Superior Court Judge. Judge Jahnke's opinion is appended, having been edited in conformance with Supreme Court procedural standards.[1]

We note that in addition to those issues ordered remanded by the superior court to the Board, certain other issues remain unresolved. In this regard the Board in its January 3, 1993 order stated in part:

> In *Sulkosky I* we declined to determine if the positions of rate clerk and dispatcher constituted suitable gainful employment. Employee submitted evidence and argued that he is still unable to perform those jobs and that they do not constitute suitable gainful employment. That issue was not scheduled for consideration at the recent hearing and Petitioners did not submit any evidence on the subject. Although that issue, and others, may still need to be resolved, we decline to do so at this time.

(Footnotes omitted.)

The judgment of the superior court is AFFIRMED. The case is REMANDED to the

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. Subsections II.E., H., I., and J. of Judge Jahnke's opinion are not reproduced since they have not been put in issue by Sulkosky in his appeal to this court.

superior court with directions to REMAND to the Board for such further proceedings as are deemed necessary to resolve all remaining issues.[2]

## APPENDIX

### *MEMORANDUM OF DECISION AND ORDER*

### I. *INTRODUCTION*

This is an appeal from a decision of the Alaska Workers' Compensation Board ("the Board"). Eugene Sulkosky, formerly a heavy equipment operator for Morrison–Knudsen Engineers, Inc., injured his lower back twice in the mid–1970s and again in October 1982 while working in Prudhoe Bay. Years of litigation ensued. In 1988, the Board determined that Sulkosky was an "odd lot" employee and was permanently totally disabled.[1] This determination was affirmed by the supreme court in 1991.

In late 1990, Aetna Casualty & Surety Company ("Aetna"), Morrison–Knudsen's workers' compensation insurance carrier, petitioned the Board to modify its 1988 decision on the ground that it had conducted surveillance of Sulkosky in mid–1990 and acquired videotape and photographic evidence which tended to show that he was not, in fact, totally disabled. After further disputes, primarily over discovery and depositions, a hearing before the Board took place in November 1992.

In January 1993, the Board issued a Decision and Order containing extensive findings of fact and conclusions of law. In brief, the Board saw

videotape and photographic evidence of [Sulkosky's] activities in April, July and October 1990. This evidence show[ed] [Sulkosky] raking piles of debris in his yard; operating a rototiller; driving; twisting; pushing; pulling; bending at the waist; squatting; reaching overhead;

bending at the waist while cranking a jack on his recreational vehicle; splitting a log for fire wood; walking on uneven ground without a cane; rowing a boat; and with assistance, lifting and pushing two boats (a 12 foot aluminum skiff and a small fiberglass boat) to the tops of trucks.

Based on this evidence and the testimony of witnesses, the Board found that:

— Sulkosky is "not a credible witness";

— Sulkosky "exaggerated the extent of his physical limitations when describing his condition to his treating physicians and in his testimony before [the Board]";

— the "conclusion in *Sulkosky I*, that [Sulkosky] was entitled to [permanent total disability] compensation," was based in part on its "observations of [Sulkosky] at the April 1988 hearing," and those "observations were based on [Sulkosky's] exaggeration of the severity of his condition";

— Sulkosky "uses his cane as a 'prop' to enhance the appearance of disability";

— "the reports from [Sulkosky's] treating physicians about his physical capabilities have been tainted by the incorrect information [Sulkosky] provided to them";

— Sulkosky "is not totally disabled" and "is capable of working full time at a sedentary job if he wished to do so," and is therefore "not an 'odd lot' employee" and "no longer entitled to [permanent total disability] compensation."

Having found Sulkosky ineligible for permanent *total* disability compensation, the Board found that he was, instead, entitled to permanent *partial* disability compensation pursuant to AS 23.30.190(a)(20), as the statute read at the time of his injury.

The Board also made several other rulings which are disputed on appeal. First, Aetna was found not responsible for the payment of certain of Sulkosky's medical bills and the

---

**2.** On remand to the Board, the question of Sulkosky's eligibility for rehabilitation benefits and whether he is other than an odd lot employee and thus is now permanently totally disabled should be addressed. As to this question, the Board previously found in part:

Based on the surveillance evidence and Dr. Miskovsky's testimony, we find Employee is

able to work for eight hours per day, 40 hours per week in a sedentary job.

This factual determination should be considered open for further review in the proceedings on remand.

**1.** The "odd lot" doctrine is discussed *infra* at Appendix—Page 15.

associated travel costs because the doctor providing the care (Dr. Brack) had not filed medical reports in accordance with Board regulations.

Second, because Sulkosky had prevailed in an interlocutory dispute over the release to him of Aetna's surveillance tapes but had not prevailed on the ultimate issue in this proceeding, i.e., his continued entitlement to permanent total disability compensation, he was entitled to payment by Aetna of only his legal *costs* relating to that discovery dispute. The (considerably greater) *attorney fees* owed by Sulkosky to his attorney, Paul Hoffman, for work done in connection with that discovery dispute were to be paid by Aetna out of Sulkosky's compensation (and thus, in effect, by Sulkosky himself).

Third, because Aetna, in an interlocutory dispute, won an order from the Board compelling Sulkosky to attend a deposition and answer Aetna's questions, Sulkosky was held not entitled to be paid for his attorney's services relating to that issue.

Finally, because the Board ruled against Sulkosky on the ultimate issue of his continued entitlement to permanent total disability compensation, his claims for additional attorney's fees and costs were denied.

Sulkosky now appeals on a variety of grounds.

## II. *ANALYSIS*

Because the injury occurred in October 1982, a number of the issues in this case must be decided according to the workers' compensation statute in effect at the time. The statute was revised and substantially altered in 1988.

### A. *Modification Jurisdiction*

■ Sulkosky begins by making an essentially jurisdictional argument. The relevant statute provides that

[u]pon its own initiative, or upon the application of any party in interest on the ground of a change in conditions ... or because of a mistake in its determination of a fact, the board may ... review a

compensation case.... [T]he board may issue a new compensation order which terminates, continues, reinstates, increases, or decreases the compensation, or award compensation.

AS 23.30.130(a). Under this statute, the Board "is granted broad discretion to modify its prior decisions and findings" and may modify its prior factual findings if it finds they are mistaken. *Dresser Industries, Inc./Atlas Div. v. Hiestand,* 702 P.2d 244, 247–48 (Alaska 1985) (citing *Interior Paint Co. v. Rodgers,* 522 P.2d 164, 168 (Alaska 1974)); *see also Hulsey v. Johnson & Holen,* 814 P.2d 327, 328 (Alaska 1991) (proceeding under this statute "invokes the Board's jurisdiction over the original claim").

Sulkosky, however, claims that because the supreme court, in 1991, affirmed the Board's 1988 decision that he was permanently totally disabled, "the Board should have no authority to reconsider [the 1988 decision]." In support of this assertion he cites *Vetter v. Wagner,* 576 P.2d 979 (Alaska 1978), a workers' compensation case which stands, in relevant part, for the unremarkable proposition that when a case is remanded, the lower court (or agency) is bound by the appellate court's rulings and can do nothing contrary to that court's disposition of the case. *Vetter,* however, is inapposite, for it dealt with reconsideration by the Board, on remand, of a substantial evidence question expressly and *finally* resolved as a matter of *law* by the supreme court in the initial appeal of the case. In this case, by contrast, no remand is involved. Rather, the Board reconsidered and modified its previous order pursuant to express statutory authorization to do so, based on evidence that did not exist when the Board and the supreme court considered *Sulkosky I* in 1988 and 1991. The order is not rendered immune from modification simply because it was earlier affirmed on appeal.

The essence of Sulkosky's argument is that these matters are *res judicata.* As his counsel stated at the November 1992 hearing, "we believe the board does not have jurisdiction to reconsider the classification of permanent and total disability because it's been affirmed all the way through the courts and back down." Transcript of Hearing, at 25 (open-

ing statement of Paul Hoffman). This contention was addressed before statehood by Judge Folta, who explained that

> although the question of *res judicata* may lurk in the background, it is not involved in this proceeding, because if the power to rehear exists, the doctrine of *res judicata* is inapplicable and likewise, if the power does not exist, no occasion arises for invoking it. The case turns, therefore, on the question whether the Alaska Industrial Board has the power to grant a rehearing and set aside or modify its awards.

*Suryan v. Alaska Indus. Bd.*, 12 Alaska 571, 573 (1950); *see also Fischback & Moore of Alaska, Inc. v. Lynn,* 453 P.2d 478, 483–84 (Alaska 1969). In *Suryan,* the court noted that, as a general matter, "an administrative body has no power to grant a rehearing or to set aside or modify its decisions except by virtue of express statutory provision or by necessary implication." *Id.* In that case, the court held that the board had no authority to reconsider its own earlier determination that it had no jurisdiction to hear a case, where the statute granting the Board the power to review its decisions limited that power "solely to the adjustment of the rate of compensation where there is a change in the physical condition of the claimant...." *Id.* In this case, by contrast, the relevant statute, as noted above, confers on the Board a very broad power to modify its earlier decisions. Sulkosky's argument on this point is frivolous and is rejected.

**B.** *Board Compliance With Requirements For Rehearing And Modification*

 Sulkosky next claims that the board "erred in the decision to terminate permanent total disability compensation by failing to discuss or apply the proper standard for a rehearing" and instead simply declaring "that it had authority to make a determination under AS 23.30.180 on continuing total disability and also had authority to modify its award under AS 23.30.130(a)." Specifically, Sulkosky complains, the Board "cited no authority for those conclusions of law" and "did not, for instance, conclude that it was required to follow the provisions of [section]

.130(a) or its regulations." Also, "[t]he Board never required the petitioner to meet the provisions of 8 AAC 45.150 in spite of requests by the employee to do so."

The statutory provisions read, in relevant part, as follows:

> (a) Upon its own initiative, or upon the application of any party in interest on the ground of a change in conditions ... or because of a mistake in its determination of a fact, the board may ... review a compensation case.... [T]he board may issue a new compensation order which terminates, continues, reinstates, increases, or decreases the compensation, or award compensation.

AS 23.30.130(a).

> In case of total disability adjudged to be permanent 66⅔ per cent of the injured employee's average weekly wages shall be paid to the employee *during the continuance of the total disability.* ... [P]ermanent total disability is determined in accordance with the facts.

AS 23.30.180 (1981) (emphasis added).

Given the plain language of the statutes, Sulkosky's first complaint is utterly devoid of merit. AS 23.30.130(a) expressly authorizes the Board to modify its own earlier orders, as does AS 23.30.180, by implication, since it is the Board which must decide if and when the "continuance" of the "total disability" has come to an end. *See* AS 23.30.110(c) (the Board is the decision-making body in workers' compensation cases). There was no need for the board to cite case law reiterating what is stated in the statutes. Moreover, the Board was under no obligation to "conclude" that it was bound by AS 23.30.130(a) or the regulations promulgated thereunder. Obviously it was *bound* by them; the question is whether it *complied* with them.

 Thus the substance of Sulkosky's objection is reduced to the question whether the Board complied with 8 AAC 45.150. The regulation reads, in relevant part, as follows:

> (a) The board will, in its discretion, grant a rehearing to consider modification of an award only upon the grounds stated in AS 23.30.130.

> (b) A party may request a rehearing or modification of a board order by filing a

petition for a rehearing or modification. . . . .

. . . .

(d) A petition for a rehearing or modification based on an alleged mistake of fact by the board must set out specifically and in detail

(1) the facts upon which the original award was based;

(2) the facts alleged to be erroneous, the evidence in support of the allegations of mistake, and, if a party has newly discovered evidence, an affidavit from the party or the party's representative stating the reason why, with due diligence, the newly discovered evidence supporting the allegation could not have been discovered and produced at the time of the hearing; and

(3) the effect that a finding of the alleged mistake would have upon the existing board order or award.

(e) A bare allegation of . . . mistake of fact without specification or details sufficient to permit the board to identify the facts challenged will not support a request for a rehearing or a modification.

8 AAC 45.150 (April 1991). Sulkosky claims that the requirements of the regulation were not met because "[t]here was never any petition which set out what findings of fact of the Board from the [1988] decision were alleged to be mistaken."

Aetna filed its Petition to Modify in November 1990 along with an Affidavit in Support of Petition for Modification. These were followed, two years later, by a Brief in Support of Petition to Modify. The Petition states that

[s]ubsequent to the date of the Board's [1988] Decision and Order in this case extensive surveillance was conducted of claimant Eugene Sulkosky. That surveillance shows Mr. Sulkosky acting for long periods of time in a full and unrestricted manner which is inconsistent with his testimony before this Board, inconsistent with deposition testimony, and entirely consistent with the vocational rehabilitation plan previously promulgated. It is further counsel's assertion that he will utilize these films to establish that there is no disability as a result of Mr. Sulkosky's injury with this employer.

In his accompanying affidavit, Aetna's counsel stated that "Mr. Sulkosky has been seen on several occasions engaging in activities inconsistent with the Board's conclusion that he is permanently and totally disabled," and that this evidence was not available at the 1988 hearing because Sulkosky was not observed, at that time, engaging in activities sufficient to justify a petition to modify. Aetna's Brief in Support of the Petition essentially repeated the same point, in somewhat broader terms: the new evidence would demonstrate that "there is, in fact, no disability as a result of the claimant's industrial injury."

The petition makes clear that what Aetna alleged was mistaken was the Board's earlier determination, based on Sulkosky's prior testimony before the Board and in deposition, that Sulkosky was permanently totally disabled. This was sufficient to satisfy the requirements of the regulation. More important, the Board obviously found the petition to be sufficiently specific, and the Board's judgment on this matter would appear to be dispositive: the regulation, after all, speaks of "specification or details sufficient to permit the *board* to identify the facts challenged," 8 AAC 45.150(e) (emphasis added), and the decision whether to grant a rehearing lies within the Board's discretion. 8 AAC 45.150(a).[2]

Moreover, it should be noted that, even if the regulation is construed as a

---

**2.** *See also Alaska Indus. Bd. v. Chugach Elec. Ass'n,* 17 Alaska 183, 192, 245 F.2d 855 (9th Cir.1957), *rev'd on other grounds,* 356 U.S. 320, 17 Alaska 575, 78 S.Ct. 735, 2 L.Ed.2d 795 ("[s]ince the board had the power to reopen the matter on its own motion, and since it did desire to reopen, the action taken is to be deemed a reopening on the board's own motion," suggesting that requirement of specific pleading in a petition to modify is for the Board's benefit). Indeed, the Board's decision and order itself—to say nothing of the initial petition to modify—could be upheld on appeal, despite a failure to state explicitly whether it rested on a theory of "mistake" or "changed conditions," " 'so long as the findings of fact disclosed the theory of the new order and it was supported by substantial evidence.' " *Fischback & Moore of Alaska, Inc.*

means of protecting an opposing party by providing notice of the basis upon which a petition for rehearing is made, rather than as a device allowing the Board to screen out frivolous petitions, Sulkosky has no basis for complaint. Error is reversible in this context only if it resulted in substantial prejudice to Sulkosky's rights. *See Fairbanks North Star Borough v. Rogers and Babler,* 747 P.2d 528 (Alaska 1987). The supreme court has explained that

> the modern trend in administrative pleading is to require simply that the parties be sufficiently apprised of the nature of the proceedings so that there is no unfair surprise. Moreover, since the basic element to be satisfied is the opportunity to prepare one's case, the actual content of the notice and information is not dispositive. The question is whether the complaining party had sufficient notice to understand the nature of the proceedings. That is, unlike a formal complaint in a civil action, defects in administrative notice may be cured by other evidence that the parties knew what the proceedings would entail.

*North State Tel. Co. v. Alaska Pub. Util. Comm'n,* 522 P.2d 711, 714 (Alaska 1974) (citation omitted). In this case, two years elapsed between the filing of the petition and the rehearing on the merits, and full discovery was had by both sides.[3] Sulkosky knew, far in advance of the hearing, exactly what Aetna's "new evidence" was and what it would be used to show. Sulkosky does not indicate how his rights were prejudiced by the asserted lack of specificity on the face of the petition, especially since that document was only an opening salvo in this round of litigation and was followed by full discovery and briefing. Sulkosky's claim of error on this point is utterly without merit.

C. *Permanent Total Disability and Its Relationship to Suitable Gainful Employment*

■ Next, Sulkosky argues that his "claim of continued permanent total disability is

presumed to be compensable" under AS 23.30.120, Brief at 14, and that "[o]nce an employee is disabled, the law presumes that the employee remains 'disabled unless and until the employer introduces "substantial evidence" to the contrary.'" These are basic propositions of workers' compensation law, and Aetna does not dispute them. Rather, it contends that there was no error precisely because it *did* produce evidence of sufficient substantiality both to rebut the presumption of compensability and to win the case on the merits. That argument is considered *infra.*

The dispute centers around the next stage of Sulkosky's argument on this point. To Aetna's suggestion that he take a job as a dispatcher or rate clerk, Sulkosky responds that "[p]hysically and mentally [those jobs] are inappropriate," because he is able only "to tinker around at various 'odd jobs' for limited periods of time." Notwithstanding any ability he might have to earn money sporadically, Sulkosky explains, his "physical condition is such as to disqualify him for regular employment in the labor market," and he is therefore totally disabled. The underlying premise of the argument is that, as Sulkosky argues, "[r]egular employment which is 'suitable gainful employment' is that which gives the employee not less than 70% of pre-injury earnings." Even if he were able to do the dispatcher or rate clerk jobs, "those are not suitable gainful employment as required by the [workers' compensation statute]," because they would not pay at least 70 per cent of his average weekly wage at the time of his injury. Thus, Sulkosky explains, the Board erred when it found that he was capable of working full-time in a "sedentary" job which would pay approximately $6 per hour, and therefore was not permanently totally disabled, because "[i]t failed at all to consider whether this met the Alaska requirement of restoration to suitable gainful employment. The employer did not show it had identified a job the claimant could do that met these requirements." In short, Sul-

---

*v. Lynn,* 430 P.2d 909, 912 n. 14 (Alaska 1967) (quoting *Jarka Corp. v. Hughes,* 299 F.2d 534, 536 (2d Cir.1962) (citing *Bethlehem Shipbuilding Corp. v. Cardillo,* 102 F.2d 299 (1st Cir.1939))).

**3.** Except for ten pages of notes not turned over to Sulkosky, discussed *infra.*

kosky argues, Aetna has not met its burden of coming forward "to overcome the presumption [of compensability] by substantial evidence that the employee is not permanently totally disabled, i.e. that there is suitable gainful employment available to him."

There are at least two components to Sulkosky's argument. To some extent, he is simply claiming that the Board erred in its factual determination that he was physically capable of working full time and was therefore not an "odd lot" employee. That is a question for "substantial evidence" review and is considered *infra*.

More important is the claim, repeated numerous times throughout Sulkosky's 50–page brief, that, because he has not been restored to "suitable gainful employment," he is therefore permanently totally disabled. This is simply incorrect. A review of some of the relevant definitions may prove helpful.

— "Disability" refers *not* to actual physical injury, but, rather, to an "incapacity *because of injury* to earn the wages which the employee was receiving at the time of injury in the same or any other employment." AS 23.30.265(10) (Supp.1982) (emphasis added).

— "Permanent total disability" was not defined in the former law. Rather, the statute provided that

> [i]n case of total disability adjudged to be permanent 66⅔ per cent of the injured employee's average weekly wages shall be paid to the employee during the continuance of the total disability.... [P]ermanent total disability is determined in accordance with the facts.

AS 23.30.180 (1981).[4]

— The "odd lot" doctrine is a well-established judicial gloss on the workers' compensation statute, though not part of the statute itself. Essentially, it provides that a worker need not be in a state of "abject helplessness" before he can be found permanently and totally disabled. *J.B. Warrack Co. v. Roan*, 418 P.2d 986, 988 (Alaska 1966). A worker may be permanently totally dis-

abled if he is unable "because of injuries to perform services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist." *Id.* Put another way, the fact that a worker is capable of performing sporadic "odd job" labor, for which a reasonably stable market does not exist, will not preclude a finding of permanent total disability. *See Alaska Int'l Constructors v. Kinter*, 755 P.2d 1103 (Alaska 1988).

— "Suitable gainful employment" was defined, at the time in question, as

> employment that is reasonably attainable in light of an individual's age, education, previous occupation, and injury, and that offers an opportunity to restore the individual as soon as practical to a remunerative occupation and as nearly as possible to his average weekly wage as determined at the time of injury.

AS 23.30.265(31) (Supp.1982).

. . . .

— Finally, AS 23.30.041(c) (Supp.1982) provides that a worker is entitled to vocational rehabilitation if "two distinct events" occur: the worker suffers a permanent disability, and that disability precludes the employee from returning to suitable gainful employment. *Kirby*, 821 P.2d at 129.

In light of these statutory provisions, it is clear that Sulkosky meshes two separate concepts when he argues that, unless and until he is offered "suitable gainful employment," he remains "permanently totally disabled." "Suitable gainful employment," as Aetna points out, is a statutory term of art used, and meaningful, *only* in the context of a determination of the employee's eligibility for *vocational rehabilitation* under AS 23.30.041. *Cf. Olson v. AIC/Martin J.V.*, 818 P.2d 669, 674–75 (Alaska 1991) (discussing "suitable gainful employment" in the context of vocational rehabilitation benefits); *Kirby v. Alaska Treatment Center*, 821 P.2d 127, 129–30 (Alaska 1991) (same). Clearly Sulkosky is "permanently disabled." Whether this disability precludes his return to "suitable gain-

---

**4.** The statute also described certain injuries, not relevant here, which constituted "permanent to-

tal disability" per se.

ful employment" is a question relevant only to his entitlement to vocational rehabilitation. It has nothing to do with the entirely separate matter of whether the *permanent* disability is *partial* or *total.*

Thus Sulkosky distorts the law when he claims that Alaska law requires that he be found "permanently totally disabled" unless and until he is restored to suitable gainful employment, i.e., unless and until Aetna "provide[s] the Board with evidence that there is a job [he] can do that would pay him 70% of his average weekly wage." [5] To avoid paying permanent total disability benefits, an employer need show only that there is "regularly and continuously available work in the area suited to the [employee's] capabilities," i.e., that he is not an "odd lot" worker. *See Summerville v. Denali Center,* 811 P.2d 1047, 1051 (Alaska 1991). Whether "suitable gainful employment" is available to the employee is, to reiterate, a separate question. Sulkosky's argument is therefore rejected. For this reason, the court need not reach Sulkosky's further argument that the Board erred by "failing to properly allocate the burden of proof regarding suitable gainful employment."

### D. *The Failure to Address "Suitable Gainful Employment"*

Sulkosky next argues that the Board erred by "failing to decide the issue of suitable gainful employment." This was, he claims, error for two reasons:

> First, the issue had been brought up time and again by the employee for nearly the past six years. Beyond that, it is part and parcel of the requirement on the employer to meet its burden of proof that the employee was restored to suitable gainful employment and, therefore, was no longer permanently totally disabled.

The second reason put forward by Sulkosky is without merit, for the reasons discussed

*supra:* whether Sulkosky's permanent disability was total or partial is a question entirely separate from the question whether, because he is permanently disabled, he has been or must be offered "suitable gainful employment." The "requirement" to which Sulkosky refers simply does not exist.

■ In the alternative, Sulkosky argues that this issue has been raised repeatedly over the years but has not been addressed by the Board. In its first decision in this case, the board declined to address the "suitable gainful employment" issue both because Sulkosky, it stated, had not appealed the Rehabilitation Administrator's decision on this issue (a statement Sulkosky disputes), and because, since it found Sulkosky to be permanently *totally* disabled, vocational rehabilitation was a moot issue. *Cf. Rydwell v. Anchorage School Dist.,* 864 P.2d 526, 531 n. 5 (Alaska 1993) (on reaching medical stability, an employee receiving reemployment benefits who is found to be permanently totally disabled must "cease reemployment training because it will be fruitless"). In its most recent D & O, the board stated that the issue of "suitable gainful employment" "was not scheduled for consideration at the recent hearing and [Aetna] did not submit any evidence on the subject. Although that issue, and others, may still need to be resolved, we decline to do so at this time." In his brief, Sulkosky does not contest the statement that "suitable gainful employment" was not scheduled for consideration at the Board's hearing.[6] At any rate, the Board has not foreclosed the issue; it simply declined to rule on it at the most recent hearing. Sulkosky is free to seek a ruling from the Board on this entitlement to vocational rehabilitation and *a fortiori*, on the "suitable gainful employment" issue. The failure to rule on it at the most recent hearing does not support Sulkosky's claim that "[t]otal reversal and remand of the AWCB's decision is necessary."

. . . .

---

5. That is, a job that would pay Sulkosky—who did not complete high school and has difficulty with reading and mathematics—well over $50,-000 per year.

6. Indeed, in what appears to be the final prehearing conference summary, dated October 20, 1992, there is no mark next to "Voc Rehab" in the section labelled "Relief Sought," nor is "suitable gainful employment" mentioned in the written notations.

### F. *Sulkosky's Employability, Credibility, and Capability*

Sulkosky next argues that the Board erred in finding that he was "employable on a regular, steady, and continuous basis," that he was not a credible witness, and that he was "capable of various actions, based on the speculation of the investigator." Each of these was a factual determination, subject only to "substantial evidence" review by this court, and must be upheld if a reasonable person, in light of all the evidence, could have reached the same conclusion; this court may not reweigh the evidence. *See Yahara v. Construction & Rigging, Inc.*, 851 P.2d 69 (Alaska 1993). The findings will be addressed in turn.

■ 1. Sulkosky begins by arguing that the Board erred when it determined, without substantial evidence to support its finding and based solely on testimony from Sulkosky's former physician, Dr. Miskovsky, that he was (a) capable of working full-time at a sedentary job and was (b) therefore not an "odd lot" employee.

(a) The objection is unpersuasive. The Board, contrary to Sulkosky's assertion, did *not* rely solely on Dr. Miskovsky's testimony. Rather, it also relied on extensive

> videotape and photographic evidence of [Sulkosky's] activities in April, July and October 1990. This evidence show[ed] [Sulkosky] raking piles of debris in his yard; operating a rototiller; driving; twisting; pushing; pulling; bending at the waist; squatting; reaching overhead; bending at the waist while cranking a jack on his recreational vehicle; splitting a log for fire wood; walking on uneven ground without a cane; rowing a boat; and with assistance, lifting and pushing two boats (a 12 foot aluminum skiff and a small fiberglass boat) to the tops of trucks.

Moreover, the Board was perfectly free, if it wished, to rely on Dr. Miskovsky's testimony. Dr. Miskovsky explained that he had previously determined Sulkosky's physical capacities (a determination relied upon by the Board in its 1988 hearing) by asking Sulkosky what Sulkosky believed those capacities

to be, and that he (Dr. Miskovsky) believed "the videotape evidence [produced in connection with this proceeding] demonstrates [Sulkosky's] physical capacities more accurately than the [physical capacities evaluation] ... relied upon in [the 1988 hearing]." Relying on both the surveillance evidence and Dr. Miskovsky's testimony, the Board found that Sulkosky was capable of working "for eight hours per day, 40 hours per week in a sedentary job" and was therefore not an "odd lot" employee and not totally disabled.

Sulkosky testified in his own behalf, as did Gary Fisher, a rehabilitation specialist employed by Sulkosky. Sulkosky explained that the "surveillance videotape evidence does not demonstrate what he is capable of doing on a regular continuous basis," and that he simply " 'over did it' " and "paid the consequences with increased pain." Fisher testified that, in light of Sulkosky's physical and mental limitations, "there is no job [Sulkosky] can return to."

There was conflicting evidence on this question, but more than enough evidence (*e.g.*, expert opinions and voluminous videotape and photographic surveillance) for the Board to conclude that Sulkosky's physical condition was such that he could work full-time in a sedentary occupation. The Board's finding on this matter was supported by more than substantial evidence and is therefore upheld.

■ (b) Sulkosky also argues, at least implicitly, that Aetna did not overcome the presumption that he remained an "odd lot" employee, and therefore totally disabled, because it introduced no evidence that there was actually work available to him, and instead simply assumed that work was available to someone capable of working full-time in a sedentary job. This argument is inextricably meshed, in his brief, with the mistaken claim that Aetna was obligated to demonstrate the availability to him of "suitable gainful employment." Taken on its own, however, it remains unpersuasive.

Professor Larson has explained that the burden of proving the availability of work is, indeed, on the employer in "odd lot" cases:

*If* the evidence of obvious physical impairment, coupled with other facts such as claimant's mental capacity, education, training, or age, places claimant *prima facie* in the odd-lot category, the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant.

3 A. Larson, *The Law of Workmens' Compensation,* § 57.61(c), at 10–405–408 (1993) (emphasis added).[7] However, Larson also explains that "[w]hen an award is modified for a reason ... going to some error in the original award, the correction may be made retroactive to the date of the original award ..." *Id.* § 81.52(d), at 15–1169.

In this case, the petition to modify and the Board's D & O were based on a theory of "mistake of fact," the asserted mistake being that Sulkosky had in fact not suffered the physical impairment which the Board, in 1988, thought he had. The initial determination of "odd lot" status depended on the initial determination of Sulkosky's physical capabilities; having revised this initial determination of Sulkosky's "obvious physical impairment," such that he never was placed, *prima facie,* in the "odd lot" category to begin with, there was no presumption of entitlement to "odd lot" status to overcome.[8]

■ 2. Sulkosky next claims that the Board erred by finding, without substantial evidence, that he was not a credible witness. Sulkosky's argument on this point consists largely of an attack on the validity of Dr. Miskovsky's testimony, and of a benign explanation of the fact that Sulkosky used a cane in his appearances before the Board but had not done so while on the camping trip that was the subject of much of the videotape surveillance.

Credibility is a determination to be made by the Board:

The board has the sole power to determine the credibility of a witness. A finding by the board *concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions.* The findings of the board are subject to the same standard of review as a jury's finding in a civil action.

AS 23.30.122. The Board found, *inter alia,* that Sulkosky had "exaggerated the extent of his physical limitations when describing his condition to his treating physicians and in his testimony before us," that he had exaggerated the severity of his condition when appearing before the Board in 1988, that the "surveillance evidence clearly demonstrates that [Sulkosky] is able to walk, even on uneven ground, without the assistance of a cane and that he is able to engage in relatively vigorous activity," and that Sulkosky "uses his cane as a 'prop' to enhance the appearance of disability." On this basis, the Board found that Sulkosky was not a credible witness. That finding is supported by more than substantial evidence and must be upheld.

■ 3. Finally, Sulkosky claims that the Board erred in finding that he was "capable of various actions," based upon the "speculation" of Aetna's investigator, Wayne Willott. Specifically, Sulkosky argues that the Board's finding that he was "able to walk, even on uneven ground, without the assistance of a cane" and "able to engage in relatively vigorous activity" was, "apparently," based upon Willott's testimony before the Board, and that that testimony was mere "speculation" upon which a reasonable person would not rely.

7. It should be noted that the term "suitable work," as used by Professor Larson, is not the same thing as "suitable gainful employment," as that term of art is used in the Alaska statutes. Indeed, the latter term made its first appearance in the statutes in July 1982 at the same time as AS 23.20.041, the section pertaining to vocational rehabilitation, was enacted.

8. Thus, the situation here is quite different from one where, for example, the Board leaves intact an initial determination of an employee's physi-

cal impairment, and simply revises its view as to whether his overall capabilities, in light of that impairment, are so limited, in the context of the local job market, as to place the employee in the "odd lot" category. In such a case, the employee would be entitled to a presumption of continuing "odd lot" status until substantial evidence were introduced to the contrary, i.e., evidence that jobs actually were available to persons with capabilities similar to the employee's.

This is unpersuasive. The Board clearly relied on the surveillance evidence itself in making these findings. Moreover, while the Board apparently did not rely on Willott's testimony in making its findings ("We rely on the surveillance evidence and Dr. Miskovsky's testimony"), it was perfectly free to do so if it wished. It was Willott who made the videotapes and observed Sulkosky during the times in question. He could testify to what he saw or did not see. If he was, as Aetna's agent, a biased witness, the Board could take that into account in making its determination of what weight to accord his testimony under AS 23.30.122. Sulkosky's claim of error on this point is unpersuasive.

### G. *Attorney Fees*

█ Sulkosky next argues that the Board erred by ordering that attorney fees of $6,767.50, relating to his successful efforts to force Aetna to release its surveillance and investigative materials, be paid out of his own compensation. He claims that Aetna should have to pay these fees because he succeeded on the issue.

In support of his position, Sulkosky cites only AS 23.30.145. The relevant subsection of that statute provides that "if the claimant has employed an attorney in the *successful* prosecution of the claim, the board shall make an award to reimburse the claimant for the costs in the proceedings...." AS 23.30.145(b). The supreme court has stated clearly that "the employee must be successful on the claim itself, not on a collateral issue." *Adamson v. Univ. of Alaska*, 819 P.2d 886, 895 (Alaska 1991). "[T]he Board should look at who ultimately is successful on the claim, as opposed to who prevails at each proceeding." *Id.*

█ In this case, "[Sulkosky's attorney] was successful in securing the release of the surveillance materials before the [November 1992] hearing. However, the underlying issue and the reason for the surveillance was [Sulkosky's] continued entitlement to [permanent total disability] compensation. [Sulkosky] has not prevailed on that issue." In short, Sulkosky prevailed on an interlocutory discovery dispute; even as to this dispute, he did not prevail entirely, as Aetna was allowed to redepose him before releasing the videotapes and was allowed to retain any evidence which revealed the work product of its attorney or investigators. More important, as the Board pointed out, Sulkosky lost on the merits of this case: Aetna claimed, and the Board found, that Sulkosky was not, in fact, permanently totally disabled. Sulkosky was therefore not entitled to have Aetna pay for his attorney's work on the discovery dispute. For the same reason, Sulkosky is not entitled to payment by Aetna of various other costs and fees, including $4,200 in fees for his vocational rehabilitation specialist's testimony.

. . . .

### III. *SUMMARY*

The Board's decision that Aetna did not have to pay Dr. Brack's medical bills for services provided to Sulkosky, due to the doctor's failure to file the proper forms, is REVERSED, and Aetna is ordered to pay for the medical treatment at issue and for the travel costs associated with receiving that care. Sulkosky's claim that Aetna's controversion of this matter was frivolous is REMANDED to the Board. In all other respects, the Board's decision in this matter is AFFIRMED.

Dated at Ketchikan, Alaska, this 5th day of April, 1994.

/s/ Thomas M. Jahnke
Superior Court Judge